### SPRAGUE and others *vs.* DUEL, survivor, &c.

Where the mental capacity of a party is such that a jury, upon the execution of a commission of lunacy issued against him, would not be justified in finding him to be of unsound mind, the court will not set aside a conveyance, made by him, although his intellect has become very much impaired, unless an unconscientious advantage has been taken of his situation to obtain such conveyance without a sufficient consideration.

A conveyance, made by a person of weak and impaired intellect, will not be set aside as improperly obtained, where the consideration of such conveyance was a contingent liability assumed by the grantee, the probable extent of which liability, at the time it was assumed, was equal to the value of the property conveyed; although, by subsequent events, it turns out that the amount of the liability assumed was much less than the value of such property.

THIS was an appeal, from a decree of the vice chancellor of the eighth circuit, dismissing the complainant's bill. The opinion of the vice chancellor, containing a statement of the material facts in the case, will be found in 1 *Clarke's Chan. Reports,* 90.

*T. T. Sherwood,* for the appellants.

*M. Fillmore,* for the respondent.

The Chancellor. Two questions are presented for consideration, upon the pleadings and proofs in this case : 1. Whether R. Sprague, the father of the complainants, was so destitute of mental capacity as to be incapable in law of executing a valid deed ? 2. Whether an unconscientious advantage was taken of a weakened and impaired mind, to obtain a conveyance from him which ought not, in equity, to be sustained? And upon both of these questions I think the vice chancellor arrived at a correct conclusion. Although some of the witnesses swear, in general terms, to the mental incapacity of R. Sprague to transact such business, the facts testified to, by all the witnesses who appear to know any thing upon the subject, satisfy me that he was not of *unsound mind,* in the legal sense of that term. In other words, I am satisfied that if a commission of lunacy had been issued against R. Sprague, at the time of the execution of this deed, the jury would not, upon the evidence in this case, have been justified in finding him of unsound mind.

It is evident, however, that his mind had been impaired to a considerable extent, by the epileptic fits to which he had been subject for several years. And the helpless situation of his wife had tended still further to break down his spirits. Had the respondent, therefore, taken advantage of his situation to obtain from him a hard and unequal or an unconscientious bargain, this court would not permit the agreement to stand, for any thing more than the consideration actually paid. But here I think the evidence clearly shows that the responsibilities which the respondent assumed were, at the time of the conveyance from R. Sprague to him, at least equal to the then value of the property conveyed. The fair value of the land, in March, 1831, could not have been more than from $20 to $25 an acre, at the utmost; and it is very doubtful whether it was actually worth $20, in the state it was then in. And for this lot of land, worth from $1100 to $1400, at the utmost, the respondent assumed to

support Sprague and his wife, both of whom were then between forty and forty-five years of age; the one a lunatic, requiring watchfulness and care, and the other constantly exposed to these repeated attacks of epilepsy. The value of the responsibility which the respondent assumed, must not be measured by the events which afterwards occurred, but by the probable extent of that responsibility when it was assumed.

There is no evidence that Mrs. Sprague's insanity had in any way impaired her health. And if she was then forty years of age, her chance of life, according to the tables of mortality, was about twenty-three years and a half. Calling it worth but two dollars a week to board and clothe her, and to supply her with all needful care and attention, in sickness and in health, the then value of an annuity of $104, for twenty-three years and a half, would have been more than $1100. And even if she was forty-five, the value of her support, at that low rate, for the probable duration of her life, would, if paid down, be more than $1000; upon the principles on which the purchase of a life annuity is calculated. The chance of the continuance of R. Sprague's life, owing to fits to which he was subject, was probably not as great as that of his wife. But calling it twelve years, and the expense of his board and clothing, &c. only $1,50 per week, the present value of an annuity for the twelve years, would exceed $500. No prudent and discreet man, therefore, who understood the nature of the risk he was assuming, would have entered into an agreement for their support, as this respondent did, for the full value of this farm as it then was; except as a matter of charity to relatives, who were incompetent to provide for themselves during the probable continuance of their lives.

It must be recollected, too, that Duel, by this agreement, was not entitled to any portion of the services of Sprague, or of his wife. And Sprague being relieved, by this arrangement, from the care of his lunatic wife, and being furnished with a home and with board and clothing for himself as well as his wife, he was at liberty to appropriate the proceeds of all the labor which he was able to perform, to the support and maintenance of his younger children; who were then too young to earn their own

Sprague *v.* Duel.

living. The disposition which Sprague made of his property, under the advice of the committee and members of the society of friends, with whom he consulted, appears, therefore, to have been more judicious and provident than most men, even in the possession of a strong and vigorous intellect, would have been able to make under similar circumstances. And the respondent having assumed the risk of the continuance of the lives of Sprague and wife until the expenses of their support might have exceeded the value of three such farms, it would be unconscientious, and inequitable, to deprive him of the advantage which subsequently accrued to him, by dispensations of Providence that terminated both of their lives so much sooner than could have been anticipated when the agreement for their support for life was made.

It is not necessary to say any thing about the personal property, as William Duel is dead; and the heirs at law, as such, are not the proper persons to institute a suit as to the personal estate of their father. The executor, or administrator, only, can sustain a suit for the personal estate of the decedent which has been improperly obtained from him, in his lifetime. For this reason the objection, that the bill is multifarious, was not well taken. For these complainants were not entitled to any relief, against either of the defendants, as to the personal property. (*See* 9 *Paige's Rep.* 194.)

The decree of the vice chancellor is not erroneous; and it must be affirmed, with costs.