# PHILIP F. SCANLAN

*v.*

# THOMAS COBB, Guardian, etc.

1. LUNATIC—*conveyance—terms on which it will be set aside.* Where a conveyance of land is set aside in equity on the ground of the insanity or lunacy of the grantor, and an account taken, the grantee, having purchased in good faith, without any knowledge of the alleged insanity, will be entitled to be reimbursed that which he has paid on the same.

2. Where a purchase from an insane person is made, and a conveyance obtained in good faith, for a sufficient consideration, without knowledge of the insanity, the consideration must be returned before the conveyance can be avoided.

3. Where a person, apparently of sound mind, and not known by the other party to be otherwise, enters into a contract which is fair and *bona fide*, and which is executed and completed, and the property which is the subject matter of the contract can not be restored so as to put the parties *in statu quo*, courts have held that such contract can not be set aside either by the alleged lunatic or those who represent him.

4. PARTIES IN CHANCERY—*bill to avoid deed for insanity.* Where a conveyance of land is sought to be set aside for insanity in the grantor, and also a deed of trust given by the grantee to secure the payment of money, the person whose debt is thus secured, as well as the trustee, is an indispensable party to the suit.

APPEAL from the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

Messrs. LYMAN & JACKSON, for the appellant.

Messrs. MONTGOMERY & WATERMAN, for the appellee.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The appellee, Thomas Cobb, acting as guardian of Mrs. Fanny Hendricks, by virtue of an order of the Probate Court of St. Louis, Mo., made on the 24th day of October, 1874, adjudging her insane and appointing him her guardian, filed his bill in the court below, against Philip F. Scanlan and David B. Lyman, praying for a decree setting aside a deed executed by his ward to Scanlan on the 4th day of February, 1871, for

a certain lot on Fourth avenue, in Chicago, and a deed of trust on the same property, executed subsequently by Scanlan to Lyman, as trustee of one Aaron C. Goodman, and also requiring Scanlan to account for the rents of the property. The ground upon which this relief was prayed was, that Mrs. Hendricks was insane when she executed the deed to Scanlan.

Scanlan and Lyman answered separately. Scanlan denied the insanity charged, and alleged that he was a purchaser in good faith, for full value, without any notice that it was claimed Mrs. Hendricks was insane. Lyman denied all knowledge of the alleged insanity of Mrs. Hendricks, and set up that Goodman, in good faith, loaned Scanlan $4000, on the security of the lot, and accepted the deed of trust upon the belief that the title was in Scanlan, as disclosed by the records.

The court, on hearing the evidence, decreed that the deed to Scanlan and the deed of trust to Lyman be set aside; that Scanlan account for the rents of the property; and directed the master in chancery to state and report the account.

The master reported a balance due from Scanlan of $784.17, for which a personal decree was rendered against him.

The appeal is prosecuted by Scanlan only.

There are two grounds, at all events, upon which, in our opinion, the decree should be reversed:

1st. The evidence is clear that Scanlan had no personal knowledge that Mrs. Hendricks was insane when he purchased and paid for the property. He negotiated with Van Wormer, who was acting under a power of attorney, ample in its terms and regular upon its face, and Van Wormer not only failed to communicate to Scanlan that Mrs. Hendricks was insane, but he persists that she was perfectly sane, both when she executed the power of attorney to him and when she acknowledged the deed to Scanlan, and for a long time subsequent thereto. The deed was executed and acknowledged before Lucien B. Adams, a United States Commissioner at Springfield, in this State, who, many years before, had been acquainted with Mrs. Hendricks, and he was also of opinion she was perfectly sane at the time. It does not appear that Scanlan had ever had any per-

sonal acquaintance with Mrs. Hendricks prior to his purchase, and the proof is uncontradicted that always before, and for some months after she conveyed to him, she was suffered by her friends to travel at her will and do as she pleased in every respect. The price paid for the property may have been less than its actual worth, but if Van Wormer tells the truth, it was the highest that he could then obtain for it. There was an urgent necessity for immediate sale. It was incumbered by a deed of trust securing a debt for $700, with accruing interest, which was past due, and the creditor was refusing to extend the time of payment; in addition to which, there were claims due, which were liens on the property, for taxes and special assessments, amounting in the aggregate to $168.68. Reasonable effort was made, by advertising, both in a daily newspaper and with a prominent real estate dealer, to procure purchasers. Mrs. Hendricks neither had money herself, nor was able to procure any from her friends, to relieve the property from the liens, otherwise than by its sale. We fail, in the entire evidence, to discover sufficient grounds to question the good faith of Scanlan in making the purchase.

The court below, in directing the account, excluded the consideration of payments made by Scanlan, other than those which constituted liens on the property at the time of the purchase. In this, there was error. Scanlan having acted in good faith, and without culpable negligence, is, upon the clearest principle of justice and morality, entitled, at all events, to be reimbursed that which he has paid, and which Mrs. Hendricks has had the benefit of. Courts of equity interfere to set aside conveyances made by insane persons, upon the ground of fraud—it being presumed that the lunatic, by reason of his or her condition, has been overreached—and it could not be tolerated that while protecting the lunatic against fraud, they should aid him or her in committing frauds upon others. There is no more reason, in good morals, why a lunatic should not pay his or her debts lawfully contracted, or those which are clearly and unquestionable contracted for the benefit of the lunatic, than why a sane person should not; and it is equitable

and right that a person paying such debts for the lunatic, under an honest belief that he was legally obligated so to do, although it turns out he was mistaken as to the obligation resting upon him, should be reimbursed.

In *Menkins* v. *Lightner*, 18 Ill. 282, the decree was reversed solely upon the ground that the amount of purchase money paid to the lunatic was not allowed to the other party in stating the account. And the English doctrine, and that recognized generally by the courts in this country, is, where a purchase from an insane person is made and a conveyance obtained in good faith, for a sufficient consideration, and without knowledge of the insanity, the consideration must be returned before the conveyance will be avoided. And the courts have gone further, and held, that where persons apparently of sound mind, and not known by the adverse party to be otherwise, enter into a contract which is fair and *bona fide*, and which is executed and completed, and the property which is the subject of the contract can not be restored so as to put the parties *in statu quo*, such contracts can not be set aside either by the alleged lunatic or those who represent him. *Eaton* v. *Eaton*, 8 Vroom, 108; *Niel* v. *Morley*, 9 Vesey, Jr. 478; *Molton* v. *Camroux*, 2 Exch. 487; *Price* v. *Berrington*, 7 Eng. Law & Eq. 254; *Carr* v. *Holiday*, 5 Ired. Eq. 167; *Sprague* v. *Duell*, 11 Paige, 480; *Loomis* v. *Spencer*, 2 id. 153; *Young* v. *Stevens*, 48 N. H. 133; *Lavere* v. *Gilkyson*, 4 Barr, 375; *Beale* v. *Lee*, 10 id. 56; *L. C. N. Bank* v. *Moore*, 78 Penn. State R. 414.

The items of $28.93 and $22.50, paid by Scanlan to Wright & Terrill, seem to have been honestly due to them from Mrs. Hendricks, and since they were paid upon her order to Wright & Terrill, without notice that she was insane, there can be no question they were paid in good faith, and they should be allowed.

The $2200 paid by Scanlan to Van Wormer on the deferred payments, seems also to have been paid in good faith; and Van Wormer testifies that he paid all that he received, and more, to Mrs. Cobb, the wife of appellee, and sister of Mrs.

Hendricks, for Mrs. Hendricks. If Mrs. Hendricks received the benefit of this money, either in the payment of debts, or in the furnishing of necessaries for her use, there can be no question she should be held responsible for it. But even if she did not thus receive the benefit of it, it would seem, on the principle recognized by the authorities above referred to, her recourse should be on Van Wormer and not on Scanlan.

2d. The bill discloses, as well as the answers and proofs, that after the execution of the deed by Mrs. Hendricks to Scanlan, Scanlan executed a deed of trust on the property to Lyman, as trustee, to secure a loan of $4000 he had effected from Aaron C. Goodman, on the faith of this security, and to whom he gave his promissory note for the amount. Lyman had but the naked legal title, with the duty to sell on default of payment of the amount secured by his deed, when due, but the substantial equitable interest was in Goodman. The rule in such cases, as to parties, is thus stated in Story Equity Pleadings, § 207: "The general rule in cases of this sort is, that in suits respecting trust property, brought either by or against the trustees, the *cestuis que trust* (or beneficiaries), as well as the trustees, are necessary parties. And when the suit is by or against the *cestuis que trust* (or beneficiaries), the trustees also are necessary parties. The trustees have the legal interest, and therefore they are necessary parties. The *cestuis que trust* (or beneficiaries) have the equitable and ultimate interest to be affected by the decree, and therefore they are necessary parties." See, also, 1 Daniell's Ch. Pleading & Prac. (Perkins' Ed.) 252. The rule has some exceptions, unimportant however, to the present question.

Goodman was clearly a necessary party, and it was error to deprive him of his security without giving him an opportunity to be heard.

We are by no means satisfied with the proof of the insanity of Mrs. Hendricks, at the time she executed the deed to Scanlan. Her three sisters, Mrs. Cobb, wife of appellee, Miss Georgia Moseley, and Mrs. Fowler, as well as the husband of Mrs. Fowler, are quite positive that she was insane as early as

1868, yet they acted, until some time after the execution of the deed, as if they believed she was sane. They made no effort to have a conservator or guardian appointed for her. They permitted her to go and come at pleasure, and made no effort to interfere with her control of her property. There is no evidence that either of them, prior to her conveyance to Scanlan, (with the exception of Mrs. Cobb, and in this she is contradicted,) ever spoke of her to others as insane. Miss Mosely, who discovered, as she now says, from her letters in 1868, that she was insane, and that she was frequently in peril of her life from her, on the 4th of July, 1869, wrote to Mrs. Hendricks' agents at Chicago, Wright & Terrill, informing them of her recent arrival in St. Louis and of her serious sickness, but then convalescence, requesting them to write to Mrs. Hendricks a full account of the situation of her business in their hands—in other words, requesting them to correspond with and communicate information to a person who was, by reason of her insanity, incapable of corresponding or comprehending business matters.

Mr. Fowler, who discovered that she was wild, incoherent, unable or disinclined to any labor, and had difficulty in preventing her from drowning his child, wished her to stay with him as a housekeeper, in consequence of his wife being in ill health.

And Mrs. Cobb permitted her to leave her house for Chicago, only going with her to the cars, with no one to watch or look after her, and with no assurance of any proper person to receive her at Chicago, with from one to two hundred dollars on her person.

Mrs. Hendricks entered The Ulrich Home, at Springfield, Illinois, in December, 1870—came there unattended, made her own arrangements for remaining there, and left there in the following April, of her own accord, and unattended.

These circumstances are not absolutely incompatible, it is true, with the testimony of these witnesses, that she was all the while incompetent to do any legal act by reason of her in-

sanity, but their tendency is strongly to discredit the accuracy of their memories and judgments.

There are several other witnesses who corroborate these witnesses, however, in the opinion that Mrs. Hendricks was insane during the winter of 1870–71, and afterwards; but none of them speak of any test that could be regarded as conclusive as to the strength of her mind in regard to business matters. They speak of her being sometimes dull, sleepy, indolent, careless in her dress, and disgusting and wanton in her attitudes; that she was sometimes irritable and wild in her manner, and incoherent in her speech, and had a strange look in her eyes. Van Wormer and Adams testify that she talked rationally about her business matters, and that when she executed the power of attorney and the deed, in their opinion she was sane and competent to transact business. Wright & Terrill were her agents for the care and renting of her property in Chicago, and they had communication with her by letter from 1866 until after the property was conveyed to Scanlan, and they never discovered any symptoms of mental derangement or weakness in her letters. Judge Moody, of St. Louis, conversed with her, after the execution of the deed, probably in 1871, just before she became an inmate of The House of the Good Shepherd, and he thought she was perfectly rational. Woodward, and a brother of Scanlan, had a lengthy conversation with her, after she became an inmate of The House of the Good Shepherd, and they discovered no symptoms of insanity. Hale, the clergyman, and Dresser, the physician in charge of the Ulrich Home, discovered nothing indicating insanity in her.

She resided with her sister, Mrs. Fowler, at Logansport, Ind., for some time in the spring and summer of 1871, and, during that time, visited and professionally consulted McConnell & Thornton, attorneys at law. The visit occurred on the 3d of May, 1871, just three months, lacking one day, after she executed the deed to Scanlan. McConnell testifies that he had never seen or known of her before; that she communicated to him the details of the transaction with Scanlan; stated her business very lucidly and clearly, and from the information

communicated by her, from her memory alone, he wrote to Van Wormer, who was also a stranger to him, at his address, 514 Pine street, St. Louis, Mo., giving the number and amounts, and months when due, of the Scanlan notes, what they had been obtained for, saying that she had been informed he had turned them over to Mrs. Cobb, who had no authority to receive them, and requesting that he obtain them and send them to her, and that she should hold him personally accountable for the notes. He says her statements were as coherent and intelligent as those of any person for whom he ever transacted business, and, from what he observed, her mind was in a perfectly healthy condition.

It would seem, the discrepancy between the witnesses might, probably, be reconciled without serious difficulty, by bearing in mind the undisputed facts as to the manner of the life which Mrs. Hendricks led prior to 1869, and her unfortunate habits after that period. She was a prostitute, and had purchased the property in controversy in 1866, for the purpose of keeping a brothel upon it, which, for a time, she did. Afterwards, she caused the property to be rented, and went to Montana, traveling with a cashier to some bank there, as his mistress. From Montana she went to California, and thence to some point on the lower Mississippi. There is no pretense that her evil ways were abandoned in California, and her letters show she was in trouble with the police while on the lower Mississippi. Finally, in June, 1869, she was found by her sister, Mrs. Cobb, at the Planters' House, in St. Louis, very sick, and, as Mrs. Cobb says, insensible. She had, not unnaturally, contracted, in her disorderly life, the vice of drunkenness, and the use of both stimulants and opiates, in excess, clung to her until some time after the execution of the deed to Scanlan, if, indeed, she has yet abandoned it. The Ulrich Home, at Springfield, of which she was an inmate when she executed the deed to Scanlan, is a reformatory for fallen women, as is also The House of the Good Shepherd, which she entered at St. Louis. Her entrance, as we have before observed, of The Ulrich Home, was voluntary, and, although a watch was attempted to be kept upon the movements of its inmates, there was no forcible restraint

of their liberty; and it is in proof that Mrs. Hendricks, while there, frequently visited a saloon near by, and was many times under the influence of some degree of intoxication. To what extent she had access to opiates, is not clear. The fair presumption, from all the circumstances, however, is, as frequently as to intoxicating liquors. A mind demoralized by such a life, and stupefied with stimulants and opiates, it would seem, would oftentimes appear to those unfamiliar with the causes operating upon it, as crazed in the highest degree; and yet, when the effects of drunkenness would pass off, it might possess, in a business point of view, more than ordinary acuteness and intelligence. It seems to us most probable, that what some of the witnesses thought insanity, was, in fact, but drunkenness, or the fits of melancholy and despondency naturally following it, aggravated, perhaps, by remorse, arising from the recollections of a life of sin and shame.

This view will harmonize the statements of witnesses, apparently equally honest and disinterested, in the expressions of different recollections and opinions, while any other presents a conflict to be settled only by determining that some of the witnesses have committed perjury.

The decree is reversed and the cause remanded.

*Decree reversed.*