CHARLES V. PECK *et al.*

*v.*

MARY M. BARTELME, Conservatrix.

*Opinion filed February 21, 1906—Rehearing denied April 4, 1906.*

1. DEEDS—*when consideration must be returned before a deed will be set aside.* A deed by a feeble-minded person for fair consideration, which she has received, made long before there had been any judicial finding as to her mental condition, will not be set aside without a return of the consideration, where there was no fraud, bad faith or undue influence on the part of the grantee, who expended the amount of the consideration in furnishing the grantor with support and the necessaries of life.

2. MORTGAGES—*when mortgagee is not entitled to full protection as a bona fide purchaser.* Upon a bill to cancel a deed and mortgage and for an accounting, if the mortgagee, at the time he loaned the money, knew that the land was in the possession of the complainant, who claimed adversely to the mortgagor, he is not entitled to protection as a *bona fide* purchaser except to the extent of taxes and other legal charges on the land which he paid, where the complainant received no part of the consideration for the mortgage.

APPEAL from the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

JOHN C. TRAINOR, for appellants.

GIDEON S. THOMPSON, for appellee.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

This is a suit in equity begun by Ella M. Peck, by the appellee, Mary M. Bartelme, her next friend, in the circuit court of Cook county, against the appellants, Charles V. Peck, Carrie A. Peck, his wife, and Benjamin F. Hayes, for the purpose of setting aside a conveyance by said Ella M. Peck to her brother, the defendant Charles V. Peck, and subsequent conveyances, and a mortgage made by Charles V. Peck to the defendant Benjamin F. Hayes, and asking for

an accounting for rents and profits. During the pendency of the suit Mary M. Bartelme was appointed conservatrix of said Ella M. Peck, and thereafter appeared in that capacity and prosecuted the suit. The defendants answered the bill denying all the material allegations, and Benjamin F. Hayes filed a cross-bill praying for a foreclosure of his mortgage. Charles V. Peck and Carrie A. Peck were defaulted on the cross-bill, and the complainant answered it denying the validity of the mortgage. The cause was heard in open court before the chancellor, and a decree was entered dismissing the cross-bill for want of equity, finding all the material allegations of the original bill to be true and canceling all the conveyances and mortgage. This appeal was prosecuted from that decree.

Henry C. Peck, who owned four hundred and fifty-six acres of land in Bloom, Cook county, died in May, 1872, leaving a widow and ten children as his heirs-at-law. Ella M. Peck was one of the children and was born in 1868. There was a partition proceeding, in which the dwelling house and land connected with it were set off as a homestead, and a tract of forty-six and two-thirds acres was set off to Ella. Twenty years after the death of her father she executed the deed in question on June 22, 1892, for that tract of land to her brother Charles V. Peck. The deed expressed a consideration of $2000, but the actual consideration agreed upon was $1200. Soon afterward Charles V. Peck conveyed the land to Ezra J. Starr, and Starr conveyed it to Jesse B. Thompson, and Charles V. Peck afterward acquired the title from Thompson on July 24, 1901. On August 1, 1901, Charles borrowed from Benjamin F. Hayes $1200 and executed a mortgage on the land to secure the loan. The ground alleged in the bill for setting aside the conveyance by Ella and the subsequent conveyances and mortgage was, that at the time of the execution of her deed she was a feeble-minded person, incapable of making a valid conveyance. The bill was filed about ten years after the conveyance was made, and

there was never any adjudication that Ella was incapable of acting for herself until after the bill was filed.

At the time of the hearing of this case, in 1905, Ella had been subject to epileptic fits for several years and her mind and memory had been affected to a considerable extent by that disease, but the evidence as to her mental condition about fifteen years before, when the deed was made, is in irreconcilable conflict. The burden of proving want of capacity was upon the complainant, and the evidence that she was not capable came mostly from a brother-in-law and a Mrs. David, while her mother, a sister and three brothers, who were all the members of her family testifying in the case, considered her entirely capable of executing the conveyance. Charles V. Peck and his wife, of course, were not witnesses. The testimony of the brother-in-law, Thomas King, was greatly weakened by the fact that he had taken a deed from Ella for her interest in the homestead tract in which she had a reversion, and also by the fact that she had been a member of his family for four or five years just before making the deed, and had been left in charge of the house and his young children for several days at a time. His testimony was also evidently colored by a hostility to Charles and a desire to buy the land himself. He had taken possession of the land after the death of Henry C. Peck and had enclosed it with his own land and had bought out some of the other heirs. He had never paid any rent to Ella or any one else, and in later years had not even paid the taxes. The witness Mrs. David had been in the charge of Ella as a teacher in an institution at Lincoln, and in her testimony said that she knew her all the time she was in that institution, from 1879 to 1882,—three or four years,—when, in fact, she was there from 1879 to 1888. The witness was evidently either mistaken as to the person or facts, or knew nothing about Ella for the last six years while she was in the institution. The testimony of those two witnesses was corroborated to some extent by the opinion of a doctor who

examined Ella during the hearing, who thought that her
condition was the result of arrested or incomplete develop-
ment and that it had existed for a good while. The testimony
of the teacher and some other evidence indicated that Ella
had the disposition, habits and amusements of a child rather
than of an adult.

Aside from the opinions of the witnesses as to capacity,
the following definite facts were proved: Shortly before the
death of Henry C. Peck he was visited by a wealthy sister-in-
law, Mrs. Ferdinand Peck, and she took a fancy to Ella, who
was then a bright and pretty child. She had previously had
a sickness of some kind which left a slight affection of the
right arm and foot, causing the foot or toe to drag to some
extent. Mr. Peck, knowing that he would not live long and
believing that Ella would be better cared for by the sister-
in-law and have better advantages than if left in a large
family in their financial condition, gave her to the sister-in-
law with the consent of his wife. Mrs. Ferdinand Peck took
Ella and kept her for some time with all the advantages of
a luxurious home, but afterward made arrangements with
an older half-sister of Ella, Sarah Heazlitt, to take her and
care for her, for which she paid Mrs. Heazlitt $50 a month.
Mrs. Heazlitt had consumption and went to California, and
before going placed Ella in the State institution for feeble-
minded children at Lincoln, Illinois, in 1879. By what
means or upon what representations she was placed in the
institution does not appear. After the death of the father the
family appears to have scattered, and, as sometimes happens,
there was but little communication between the members,
but the others denied that they ever knew that Ella was in
an institution for the feeble-minded. They said they sup-
posed she had been placed by the sister in some kind of a
school for girls or young ladies, and having been given to
the aunt and put in the charge of the sister they understood
she was cared for. There was some correspondence between
them at times, but they denied all knowledge, until 1888,

that she was in an institution for feeble-minded. She remained in the institution at Lincoln until June, 1888, when her brother Jesse went after her and took her away and took her to the farm in question, which was occupied by Thomas King, husband of one of her sisters. She lived with Mr. and Mrs. King upon the farm for about four years, doing a share of the housework and being left in charge of the house and children in the absence of Mr. and Mrs. King. She took care of the children and was accustomed to read the papers and journals to Mrs. King, whose eyesight was poor. In 1892 she went to live with her brother Jesse Peck, and a couple of days after she went there she executed the deed to Charles, who paid her $250 in cash, and the balance of the consideration of $1200 was to be paid as she wanted it. The land was not valuable and other heirs had sold their shares for less than $1200. Jesse Peck had sold the tract set off to him to his brother-in-law, the witness King, for $600. There is evidence tending to show that the land was worth more, but we are satisfied that the consideration was fair. Soon after the deed was made Charles went to Billings, Montana, and Ella went with him. She lived with him until March 13, 1895, when he went to Mrs. Nancy Gaylord, who was an experienced nurse and kept a small private hospital on Paulina street, in Chicago, and asked her to take Ella. They agreed on a price of $32 a month, and later it was changed to $20 and afterward to $15. Mrs. Gaylord moved several times, taking Ella with her. When they lived in Berwyn, a suburb of Chicago, in 1900, Ella fell in a hole in the sidewalk and broke her leg and sued the town of Cicero. She was the only witness to the accident and testified to it and recovered a judgment. No question was raised as to her mental capacity or competency to testify, and the attorney for the town of Cicero testified that he saw nothing on that trial to indicate a want of ordinary mental capacity. In interviewing her for the purposes of that suit her attorney found that she had owned some property, and he began this suit, and it

was during that time that Mary M. Bartelme was appointed conservatrix. She appeared and was substituted as plaintiff in the damage suit, and there was a judgment for $3500, which was affirmed. (*Town of Cicero* v. *Bartelme,* 212 Ill. 256.) The attorney received $1500 for his fees in the personal injury case and the conservatrix got $2000. Neither Charles nor any of his grantees were ever in possession of the land. As before stated, Thomas L. King had taken possession of it after the death of Henry C. Peck, and of late years he has claimed to hold it as a tenant for Ella. He never had any lease or paid her any rent, but has been in possession and had it enclosed with other land that he owned. About 1901 Charles wanted to sell the land, and told King that he had found a purchaser and would bring down a surveyor and have the tract surveyed off and fenced. They came for that purpose, and King refused to allow them to come on the land and had Charles arrested for trespass, and Charles then commenced a forcible detainer suit against King. On August 1, 1901, Charles gave the mortgage to Hayes but never paid any interest on the loan, and Hayes was compelled to redeem the land from tax sales and paid the taxes for several years. Charles paid to Mrs. Gaylord, in monthly payments, for the board and care of Ella, $941. Some of the other members of her family also gave Ella money, but the amount stated was paid by Charles for board and necessaries, for which she would have been liable regardless of her mental condition. Charles never received any rents or profits of the land, which were all taken by King, who continued to occupy the premises although his wife did not live with him, and she and her daughter had left the farm or been turned out. King seems to have been hostile to the rest of the family, but professed to hold the land as tenant of Ella and for her protection.

The most potent fact in evidence, and perhaps the only one on which can rest the finding that Ella was incapable of making the conveyance in 1892, is that she was an inmate of

the State institution for feeble-minded children from 1879 to 1888, and must have been regarded as one of that class. It also appears that in 1895, three years after the deed was made, Charles considered that her mind was affected when she was placed with Mrs. Gaylord. In view of all the evidence we are not disposed to disturb the finding that she was not capable of executing the conveyance, or that there was such a degree of mental weakness as to enable her to avoid the transaction. But the decree canceling and setting aside the deeds and mortgage without any return of the consideration received by her or re-payment of taxes against the property was clearly wrong. There had been no judicial finding that she was incapable of managing her estate or making a conveyance, but if she was incapable of executing the deed it might be avoided upon such terms as would be just and equitable. Whatever her mental condition may have been, there was no finding of incapacity until many years after the conveyance, during which time she received and enjoyed the actual benefit derived from the sale of the land in her support, for which she ought in equity and justice to pay. Whatever, in fact, her mental condition was, she was liable for her own support and for the necessaries supplied to her by her brother, and to set aside the conveyance without a return of the consideration would not be righting a wrong done to her so much as doing a wrong to the brother who took care of her and furnished her support in payment of the consideration. The conveyance was upon an adequate consideration of which she had the benefit, and there was no evidence of bad faith, fraud or undue influence on the part of the grantee. In such a case a conveyance will only be set aside on a return of the consideration. (*Scanlan* v. *Cobb,* 85 Ill. 296; *Burnham* v. *Kidwell,* 113 id. 425; *Ronan* v. *Bluhm,* 173 id. 277; *Eldredge* v. *Palmer,* 185 id. 618.) Charles never received any rents or profits of the land, which were all taken by King and never accounted for to any one, and consequently interest on the money paid should be

allowed. Ella received no part of the money loaned by the defendant Hayes, and when the money was loaned the land was in open and visible possession of King, who claimed to hold it for her. If Hayes could be regarded as a *bona fide* mortgagee without notice he would be entitled to protection, but we are of the opinion that the possession of King, which was the possession of Ella, was notice to him of whatever rights she had in the premises. Equity does not require that the money advanced by him should be refunded, except the taxes or other legal charges against the land which he paid. They should be refunded, and any equities between him and Charles can be settled in this litigation in the disposition of the consideration of $1191 paid by Charles.

The decree is reversed and the cause remanded.

*Reversed and remanded.*