(No. 30218.—

PETER BRANDT, Appellee, *vs.* O. A. PHIPPS, Appellant.

*Opinion filed November 20, 1947.*

HARRY S. STREETER, VERNON G. BUTZ, and JOHN H. BECKERS, all of Kankakee, for appellant.

EVA L. MINOR, and DYER & DYER, both of Kankakee, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

The plaintiff, Peter Brandt, individually and as executor of the will of Elizabeth Brandt, deceased, commenced this action in the circuit court of Kankakee County on January 30, 1945, to set aside two deeds to the defendant, O. A. Phipps. Of the instruments involved, the first is an executor's deed, dated August 7, 1940, given by plaintiff as executor of the will of Elizabeth Brandt, conveying to defendant 105 acres of unimproved farm land in Kankakee County, known locally as the Elizabeth Brandt farm. By the second conveyance, dated August 31, 1940, plaintiff, in his individual capacity as one of the heirs-at-law of Elizabeth Brandt, quitclaimed to defendant all of his interest in the Elizabeth Brandt farm. Plaintiff seeks a rescission on the ground that he was mentally incompetent when he executed the deeds. Defendant filed a motion to dismiss the complaint as to Peter Brandt, executor. The motion was taken under advisement and the cause proceeded to a hearing before the chancellor. Upon the close of all the evidence, the chancellor ruled that, under the will of Elizabeth Brandt, plaintiff, as executor, took only a power to sell the farm and, not having been exercised

within a reasonable time, the power to sell was thereby abandoned and lost. Title to the real estate having descended to the heirs-at-law and, in addition, plaintiff having been discharged as executor and the estate closed in 1941, plaintiff, as executor, was not deemed to have any legal standing to attack the executor's deed. The chancellor further found that plaintiff was mentally incompetent at the time he executed the quitclaim deed. The parties were adjudged to be tenants in common, plaintiff owning an undivided one-fifth interest in the farm and defendant owning an undivided four-fifths interest by virtue of quitclaim deeds from the other heirs-at-law of Elizabeth Brandt. By the terms of the decree, defendant's motion to dismiss the complaint as to plaintiff, as executor, was allowed and the quitclaim deed set aside, conditioned on plaintiff's repayment to defendant of one fifth of the purchase price and subject to an accounting for rents, profits and taxes. Defendant prosecutes a direct appeal to this court from so much of the decree as relates to setting aside the quitclaim deed. Plaintiff's cross appeal is directed to the part of the decretal order sustaining defendant's motion to dismiss the complaint as to plaintiff, as executor. Title to real estate being at issue, a freehold is necessarily involved.

Plaintiff is a farmer with very little formal education. His farm adjoins the Elizabeth Brandt farm to the east. Defendant, the owner of several farms in Kankakee County, is a practicing physician and surgeon. Elizabeth Brandt, plaintiff's mother, died testate in 1931, leaving six children as her only heirs-at-law. The will, admitted to probate on October 3, 1931, provides in pertinent part: "Second: * * * I direct my executor to sell and convey all of my real estate and that out of the proceeds he first pay the following legacies * * *." There follow specific legacies to her sons, Henry, Jacob and William, and small bequests to three grandchildren. By the third clause, the testatrix directed that the balance remaining after payment

of the specific legacies should be distributed among her five children, Henry, Peter, Jacob, Marie (Richmond) and Annie (Rieman). The sixth child, William, was not included among the residuary legatees. The 105 acres of farm land constituted the only important asset of the estate. Henry Brandt qualified as executor in 1931 and so acted until his death in 1933. Plaintiff, successor executor under the will, was substituted as executor on August 19, 1933.

Following a case of blood poisoning in October, 1936, plaintiff became extremely depressed and suffered from insomnia. Early in December, 1936, plaintiff consulted defendant, who examined him and prescribed rest and sedatives. Plaintiff's condition did not improve and it was arranged through defendant to have him committed to the Kankakee State Hospital as a voluntary patient. Plaintiff entered the hospital January 2, 1937. Discharged on February 24, 1937, he remained home only one month until his commitment to the Manteno State Hospital, which he entered as a voluntary patient on March 24, 1937. There the diagnosis was involutional melancholia, described as a mental disorder occurring in both men and women during the period of change of life. It is characterized chiefly by disturbances in the mood or emotions of the individual. The depression of the emotions may be accompanied by exhausting agitation, insomnia, self-abnegation, hallucinations, and abnormal ideas regarding the body. Frequently, the patient develops the idea that life is not worth living. Because it is primarily a mood disease and does not ordinarily result in the deterioration of the mental faculties, the patient has a fair chance of recovery.

Excerpts from the hospital records based on actual observation of plaintiff's mental and physical behavior disclose that plaintiff exhibited all the symptoms of involutional melancholia. As to plaintiff's condition prior to his

admission to the hospital, his wife testified that he wanted to kill himself, that he had to be restrained from carrying out an expressed desire to jump from a windmill, that he was very untidy, would not shave, let his hair grow, would soil his clothes instead of going to the toilet, and that he did not work nor handle money matters.

Plaintiff was first discharged from Manteno State Hospital in August, 1938. Recommitted to the same hospital only one month later, it was not until February 15, 1940, that plaintiff was again discharged. At the time his condition was described as "some better." After he had been at home for approximately six months, plaintiff was committed to Manteno State Hospital for the third and last time. Readmitted on August 27, 1940, he underwent a series of metrazol shock treatments commencing October 21, 1940, and was discharged as improved on December 30, 1940. While under treatment at public institutions, plaintiff was at all times a voluntary patient and has never been judicially declared insane.

The negotiations leading up to the sale of the Elizabeth Brandt farm took place in the late spring of 1940. Plaintiff's sister, Marie Richmond, was the moving figure in the decision to sell. Plaintiff took no part in the proceedings. Calling upon defendant in his professional capacity, Mrs. Richmond casually mentioned the farm was for sale and defendant offered to purchase it and the 1940 crops for $90 an acre. Apparently, the heirs agreed to accept the offer on June 5, 1940, at a meeting to which they were called by A. L. Granger, the attorney for the estate, because shortly thereafter Granger prepared a contract of sale. Plaintiff's wife was present at the meeting. In addition to an attorney, defendant employed Francis Smith, a real-estate broker, to attend to the details of the sale for him for a consideration of $50. To Smith was delegated the task of obtaining the necessary signatures to the con-

tract of sale, the executor's deed and the various quitclaim deeds. The contract of sale was dated June 25, 1940. Smith, appearing as a witness for plaintiff, testified that he first had Marie Richmond and her husband sign the contract and then took it to plaintiff's wife who agreed to sign it herself and have plaintiff sign. Two or three days later, according to Smith, the signed contract was returned to him. The contract of sale, as it appears in the record, is signed by plaintiff, alone. Tillie Brandt, plaintiff's wife, testified that plaintiff tore up the first contract and that it was necessary for Smith to provide a second contract which her husband signed without reading and without her informing him as to the nature of the instrument. The above is fairly typical of all the evidence relating to the sale of the farm.

Although the executor's deed and the quitclaim deed are dated August 7 and August 31, respectively, and plaintiff did not re-enter the hospital until August 27, Smith testified that plaintiff executed both deeds while at the hospital, that they were signed on two separate occasions about a month apart, and that both were signed several weeks after the date of notarization. The chancellor found the facts to be as stated by Smith, and we agree that this is the most accurate reconstruction of events to be gleaned from the record. On October 2, 1940, the county court of Kankakee County entered an order approving the contract to sell on a petition filed the same day. It does not appear that plaintiff's mental capacity was questioned on this or any other occasion during the probate proceedings.

As to plaintiff's mental condition during the summer of 1940, his wife testified that he never left the farm, neither worked nor conducted any business transactions, was untidy in his dress, failed to shave or have his hair cut, continued to soil his clothes, once went to the knife drawer with the announced intention of killing himself, frequently said he wished he had not been born and would

rather be dead, and entertained gloomy forebodings of future events. Mrs. Brandt further related that plaintiff often wished he had stayed in Germany, although, in fact, he had never been in Germany, and that he sometimes danced around the house thinking he was a radio artist. In addition, she testified that, upon her visits to the hospital after August 27, plaintiff failed to recognize her, and that his conversation was irrational and depressed. The testimony recounted was corroborated in all material respects by Henry Brandt, one of plaintiff's sons.

Francis Smith, the notary, was the only witness to testify as to plaintiff's condition on the occasions when the deeds were signed. From his testimony it appears that both Granger and defendant told him plaintiff was a voluntary patient at the Manteno State Hospital; that the executor's deed was signed by plaintiff during the course of a ten-minute conversation at the hospital; that, prior to affixing his signature, plaintiff remarked he did not want to sign, it was against his wishes to sell the land, the price was too low; that he was signing because the rest of the family wanted to sell the farm and did not want any trouble with the family, and that, although carrying on a normal conversation, plaintiff appeared worried. Smith was not interrogated as to the specific circumstances attending the signature of the quitclaim deed. The witness testified that he had no opinion as to plaintiff's mental capacity when the deeds were executed.

Other pertinent testimony concerning plaintiff's mental condition about the time the deeds were signed was offered by Dr. Isadore Spinka, formerly of the staff of Manteno State Hospital, who examined plaintiff on his readmission to the hospital on August 27, 1940, and again on September 3, 1940. Dr. Spinka testified, and the hospital records show, that plaintiff was oriented for time and place, both his memory and general knowledge were good, and his speech coherent and relative. The record also dis-

closes, however, that, on his readmission, plaintiff had a heavy growth of beard and refused to have it shaved; that he did not know how he got in the hospital; and that he stated he was not happy, that this was the end of the world, and that everything was wrong with him. To test the patient's judgment, Dr. Spinka asked him what he would do if he had $10,000, the plaintiff replying, "I wouldn't know what to do with it. I'd give it to you. I wish I wasn't born. It'll all a mess. I wouldn't know what to do. The world was all right until lately. Now it is no good. I'd sooner be in my grave than in any of these buildings."

The events transpiring subsequent to plaintiff's final discharge from the hospital must be reviewed. Tillie Brandt testified that, upon her husband's discharge, his condition was changed and, although he seemed more like his normal self, he was shy and not really himself until nearly a year later. More detailed information was elucidated from plaintiff's son, Henry. He related that his father was shy for several months after he returned home, but that his conversation was normal and related, he was no longer depressed nor suffered hallucinations, that he started working about the farm in January, 1941, was able to discuss business matters intelligently, and ran the farm and handled the farm income for the year 1941. Appearing as a witness in his own behalf, plaintiff testified that he remembered very little of his life between January 1, 1937, and January 1, 1941. More specifically, plaintiff asserted that he had no recollection of participating in, or even being informed of, the sale of the farm and that he did not remember having seen Francis Smith or having signed any deeds or papers necessary to the sale. Plaintiff testified that he first learned defendant owned the farm in January, 1941. Early in April, 1941, defendant stopped at plaintiff's farm for a few minutes. Plaintiff told defendant he was just the man he wanted to see and demanded to know if he had bought his mother's farm. De-

fendant replied that he had purchased the farm and, in response to further questions as to how and from whom he purchased it, stated that he bought it through Francis Smith. This much of the conversation is admitted by defendant, while plaintiff asserts that before the defendant drove away he charged defendant with stealing the farm and offered to buy it at the price he had paid for it.

On April 25, 1941, plaintiff received a single check covering his distributive share of the estate and, also, his fee as executor. This he did not deposit in his bank account until August 2, 1941. On cross-examination, plaintiff admitted he knew when he received the check that it was in settlement of the estate and represented his share of the proceeds arising from the sale of the farm to defendant. He further testified he did not want to take the check, debated the question and did not know what he could do about it and, finally, accepted it. Although executor, plaintiff did not handle the proceeds of the sale nor did he make distribution. Distribution was made by the attorney for the estate by checks drawn on a special trust account.

Plaintiff testified that, following his discharge from the hospital, he "thought that the heirs had appointed a different executor." At another place in the record, he related that, prior to distribution of the estate, Granger informed him that he would have to sign all the checks to the various legatees, from which he "figured" he was still the executor. Although the order approving the executor's final report, order of distribution and final order closing the estate were all entered in 1941, the last report or petition bearing plaintiff's signature is his final report as executor filed December 12, 1940. The record does disclose, however, two receipts dated April 25, 1941, wherein plaintiff acknowledged having received from himself, as executor, his distributive share of the estate and his executor's fee, respectively. At the trial, plaintiff did not remember having signed any receipts. From the fact plaintiff took no part

in the distribution of the estate and was not consulted in estate matters, his confusion as to his exact relation to the estate is reasonably understandable.

Continuing with events of 1941, plaintiff testified that sometime before he cashed his check he called at Granger's office a second time, announcing he was not satisfied with the sale of the farm; that he tried to find out who sold the land and who forced the sale; that Granger did not seem to want to talk about the matter, and that Granger answered by saying he did not remember because an associate had handled most of the work in the case. Granger, a witness for defendant, was not interrogated with respect to this conversation.

In 1941, defendant went into possession of the farm through a tenant. At the same time, he constructed a crib on the farm costing approximately $2100. In 1942, defendant pulled and removed the hedge fence surrounding the farm. Defendant also engaged in soil building and, in 1943, about four tons of limestone and one-half ton of phosphate were added to each acre of the farm. Plaintiff assisted in spreading the minerals for a suitable consideration, having stored the limestone on his own farm during the previous winter as a favor to defendant. Later, the same year, plaintiff became embroiled in a controversy with defendant concerning the location of the fence line between their adjoining farms. Plaintiff engaged a surveyor. When the resulting survey showed that plaintiff's farm did not extend beyond the fence line but rather the existing fence included approximately an acre of defendant's farm, plaintiff offered to buy the narrow strip erroneously included within his fence. Defendant refused to sell because of the trouble involved in changing the deeds. Plaintiff refused to abide by the survey, and the parties have done nothing about relocating the fence. Defendant testified that, following his refusal to sell the disputed strip

in October, 1943, plaintiff enlarged his demands to include a claim to all his farm, and that this was the first occasion on which plaintiff had voiced such a claim.

Shortly after the survey of October, 1943, plaintiff consulted both Granger and another attorney concerning the fence dispute. Plaintiff testified, by way of explaining his delay in bring this action, that, in November, 1943, he also consulted the second attorney concerning an action to set aside the sale of the farm to defendant; that this attorney declined to take the case because he was about to enter military service, and that, in the same month, a third attorney to whom he had been referred, likewise refused to accept the case. In May, 1944, plaintiff retained an attorney who died the following month. Plaintiff then consulted a fifth attorney, who refused to take the case because of his friendship with defendant. Finally, in the early part of July, 1944, plaintiff retained one of his present counsel and the complaint in this cause was filed on January 30, 1945. Plaintiff also sought to account for his delay by explaining that for some time after his discharge from the hospital he was fearful of a relapse. In addition, one of plaintiff's sons entered military service in 1941. A second son entered the army in January, 1942, and was killed in December of the same year.

The testimony of real-estate appraisers and psychiatrists comprises the remaining testimony adduced at the trial. Plaintiff called two witnesses who gave the farm a 1940 valuation of $125 an acre. An equal number of witnesses appearing for defendant appraised the land at $100 an acre. As to the medical testimony, while all five psychiatrists fully qualified as expert witnesses, their testimony is inconclusive. In response to hypothetical questions, two doctors produced by defendant gave their opinion that plaintiff was mentally competent when he executed the deeds here in controversy. Plaintiff's witnesses, two of whom had exam-

ined him when he was a patient at Manteno State Hospital, reached a directly opposite conclusion.

While defendant's appeal relates to the validity of plaintiff's individual quitclaim deed, plaintiff's cross appeal is more fundamental in that it raises the issue of the legal effect of his executor's deed. Certain peculiar aspects attend plaintiff's cross appeal. By the decree of the trial court, plaintiff was awarded an undivided one-fifth interest in the farm. This is the maximum recovery that plaintiff could possibly attain, irrespective of the disposition of the cause. It may thus be perceived that plaintiff prosecutes his cross appeal for the sole purpose of benefiting his brothers and sisters. Apparently, plaintiff hopes, in some strange way, that if his executor's deed be adjudged voidable rather than void and if his disaffirmance of the deed, upon regaining his sanity, be upheld, then the entire farm will revert to the estate and the marked increase in farm values since 1940, together with something like $7500 in net profits obtained by defendant from operating the farm, will accrue to the advantage of his brothers and sisters. This he expects, regardless of the facts that they engineered the sale through plaintiff, knowing full well of his mental incompetency, that they voluntarily executed quitclaim deeds in favor of defendant and then, fully cognizant of all the facts, accepted their distributive shares of the estate without objection or protest. In all fairness, it must be observed that plaintiff does not carry his argument any farther than the assertion that he effectively disaffirmed his voidable executor's deed. Although he has not favored us with his view of the consequences attending our approval of his contentions, it is difficult to foresee any result other than that described which would be favorable to his or, speaking more pragmatically, to his brothers' and sisters' cause.

Recognizing that the will of Elizabeth Brandt does not make a specific devise of her real estate, plaintiff predicates

his argument that he took legal title to the land upon the theory that an executor who has a duty to convey a fee takes a fee, even though the will does not expressly define his title. The argument advanced is closely related to the established proposition that a trustee will take exactly the quantity of interest which the purposes of the trust require. (*Wattjes* v. *Faeth,* 379 Ill. 290; *McFall* v. *Kirkpatrick,* 236 Ill. 281.) Although a few cases specifically state that a mere direction to sell real estate vests the legal title in the executor, (*Lash* v. *Lash,* 209 Ill. 595; *Greenwood* v. *Greenwood,* 178 Ill. 387; *Grove* v. *Willard,* 280 Ill. 247,) and others intimate the same result, (*Fenton* v. *Hall,* 235 Ill. 552,) the better view is to the contrary. We adhere to the more frequently pronounced rule that if a testator simply directs his executor to sell real estate and apply the proceeds to specified purposes, the executor takes a power of sale only, but if there is a devise to the executor to sell and apply the proceeds, he will take an estate in the land. *Lockner* v. *VanBebber,* 364 Ill. 636; *Pope* v. *Kitchell,* 354 Ill. 248; *Goben* v. *Johnson,* 335 Ill. 395; *Knight* v. *Gregory,* 333 Ill. 643; *Emmerson* v. *Merritt,* 249 Ill. 538; *Smith* v. *Hunter,* 241 Ill. 514; *West* v. *Fitz,* 109 Ill. 425.

The divergence between the two lines of cases is more apparent than real. In the absence of a specific devise, whether the title descends to the heirs by operation of law or whether it vests in the executor by implication of law is, ordinarily, a matter of no importance because, in either event, the title is divested by exercise of the power to sell. (*Wattjes* v. *Faeth,* 379 Ill. 290; *Goben* v. *Johnson,* 335 Ill. 395; *Ebey* v. *Adams,* 135 Ill. 80.) The circumstance that it is usually totally immaterial in whom title vests accounts, in some measure, for the language found in some of the cases relied upon by plaintiff. In the same connection, it must be observed that, under the facts of a particular case, it may become necessary to hold that

title vests in the executor by implication of law to the end that the testator's intention may be effectuated. *Greenwood* v. *Greenwood,* 178 Ill. 387, is illustrative. There, land was devised to nephews and nieces, certain of whom were nonresident aliens. By a subsequent clause, the executrix was empowered to sell the land and distribute the proceeds to the nieces and nephews. A statute, since repealed, prohibited aliens from acquiring title to land in Illinois. Obviously, in order to carry out the intention of the testator, it was necessary to hold the devise void and to find that title vested in the executrix, thus permitting the alien nieces and nephews to share in the fund created by the sale of the land as legatees. In the case at bar, plaintiff suggests no reason compelling the conclusion that title vested in him, as executor, by implication of law. Therefore, upon the death of Elizabeth Brandt, the title to the farm descended to her heirs-at-law.

Plaintiff next raises the issue of an executor's ability to exercise a power of sale nine years after the estate was opened where the will does not prescribe any time limits on the exercise of the power. The chancellor held that plaintiff's power to sell did not exist indefinitely but that it would lapse and fail upon the expiration of a reasonable time. Finding that plaintiff failed to exercise the power within a reasonable time, the chancellor held that plaintiff's executor's deed conveyed nothing and was without any force or effect. Plaintiff contends that the deed constituted a valid exercise of his power to sell; that initially it was voidable though not void, and that it is now void only by reason of his insanity at the time of execution, followed by a proper disaffirmance of the conveyance. Projecting plaintiff's theory of the case one step beyond the contentions advanced, we observe that, unless the argument is pointless, plaintiff must adopt the position that, having avoided his voidable executor's deed of 1940, he even now retains the power of sale, which, upon a success-

ful restoration of the entire farm to him, he may exercise, within the limits of the approval of the county court. Only by superimposing this line of reasoning on the arguments actually advanced do plaintiff's contentions lead to a result ending in an advantage to the estate of Elizabeth Brandt. Furthermore, it may be noted that the arguments actually and inferentially advanced by plaintiff force defendant into the anomalous position of asserting that he acquired no title or interest whatsoever in the farm as grantee under the executor's deed.

Regardless of the complexities inherent in the facts and argument, the disposition of the cross appeal turns on a relatively simple issue. The question presented is whether the failure of an executor to exercise a power of sale within a reasonable time, standing alone, suffices to terminate his authority to make a sale. Upon due deliberation, we reaffirm the rule announced in *Vierieg* v. *Krehmke, 293* Ill. 265, that where the will gives to the executor the power to sell real estate, but does not fix the time within which such power must be exercised, the executor must exercise the power within a reasonable time and, by his unreasonable delay, he forfeits his right to sell and distribute the assets of the estate. By way of clarification, however, we may add that when the delay is prolonged, the executor's failure to exercise the power of sale automatically works a forfeiture of the power. Where the delay, although unreasonable, is of shorter duration, the heirs must take affirmative action looking toward the destruction of the power of sale in order to effectively terminate the executor's power.

By excluding all the time between October 3, 1931, and August 19, 1933, when his brother was executor, and all the time after January 2, 1937, when he was first admitted to a mental hospital, plaintiff argues that there was only a period of about three years when he might have exercised the power to sell but did not and that this was

not an unreasonable delay in view of the depressed value of farm lands during this period. The argument is without merit. The power to sell came into existence in October, 1931, when Henry Brandt qualified as executor. Henry Brandt, having failed to exercise the power, it became incumbent upon plaintiff, when appointed executor, to exercise the power without undue delay. Plaintiff did nothing for three years. When he became afflicted with involutional melancholia late in 1936, a successor executor should have been appointed and the time within which the farm should have been sold continued to run. In addition, plaintiff's argument is highly inconsistent in that he asserts that he exercised the power while mentally incompetent in 1940 and yet refuses to consider almost four full years of incompetency as any part of the delay. The chancellor's finding that the power to sell was not exercised within a reasonable time is not contrary to the manifest weight of the evidence, but rather in complete harmony with the record. The period of delay was so long that the executor's power to sell terminated automatically. Moreover, even if the power was not abandoned prior to 1940, and assuming that plaintiff has made a proper disaffirmance of his voidable executor's deed, it cannot be imagined that today, sixteen years after the will was admitted to probate, plaintiff still retains a power of sale.

Defendant thus acquired title to the farm not through the executor's deed but by virtue of the quitclaim deeds from the heirs, title having descended to the heirs by operation of law. Attacking the decree of the trial court setting aside plaintiff's quitclaim deed, defendant contends that plaintiff was mentally competent when he signed the deed, that he was guilty of *laches,* that the validity of the sale is *res judicata,* and that, in any event, plaintiff ratified his conveyance. The first three contentions may be disposed of summarily. The chancellor found that plaintiff was mentally incapacitated in August and September, 1940,

and he lacked ability to deal with an adversary in con-- tractual matters. Enough of the evidence has been recounted to show that the chancellor's finding is supported by a preponderance of the evidence. The defense of *laches* is based on plaintiff's delay in commencing this action, coupled with the assertion that land values increased greatly between 1940 and 1945. Mere delay in asserting a right does not constitute *laches* but it must also appear that the party so claiming has been injured or prejudiced by the delay. (*Rogers* v. *Barton*, 386 Ill. 244; *Baumrucker* v. *Brink*, 373 Ill. 82.) As will appear more fully under our discussion of the issue of ratification, we are of the opinion that plaintiff's delay was not inexcusable and his inaction was not grounded on speculation in real-estate values. The chancellor did not abuse his discretion in holding that plaintiff was not guilty of *laches*. Whether the next defense, *res judicata,* is directed at the insanity issue or the validity of the quitclaim deed is a matter of little moment because, in the probate proceedings, the county court had no occasion to consider the mental capacity of the executor nor were the quitclaim deeds, executed by the heirs, ever before that court. The defense of *res judicata* is, therefore, inapplicable in the present case.

The principal ground on which defendant relies for reversal is that plaintiff, upon regaining his sanity, ratified his quitclaim deed or, what amounts to the same thing, failed to disaffirm the conveyance within a reasonable time. Defendant predicates his contention on the argument that plaintiff was fully restored to normal mental capacity on December 30, 1940, when discharged from the Manteno State Hospital; that plaintiff knew as early as January, 1941, defendant had purchased the farm; that plaintiff knew or should have known that he was still the executor of his mother's will; that plaintiff knowingly ratified his quitclaim deed by cashing his check for his distributive share of the estate; that plaintiff recognized defendant as

owner by contracting to spread limestone on the farm in the early part of 1943, and by offering to purchase a narrow strip of the farm in October, 1943, following the fence dispute; that plaintiff first made a demand on defendant for a reconveyance in November, 1943, and, finally, that plaintiff acquiesced in defendant's ownership of the farm for five years before instituting this action. On the other hand, counsel for plaintiff point out that he was a man of little education; that having thrice been discharged from mental institutions only to return at a later date, he had good reason to be fearful of a relapse; that he had no memory of the sale in 1940; that it took him a long time to ascertain the details of the sale; that defendant was most evasive early in April, 1941, when he informed plaintiff he had purchased the farm through Francis Smith; that he scarcely knew Granger, the attorney for the estate, Granger's father having been the attorney for the estate when plaintiff became mentally ill in 1936; that plaintiff, although executor, was not consulted in estate matters; that Granger was either unable or refused to give him information about the sale of the farm; that, in 1941 and 1942, two of his sons entered the army, one of whom was killed, and the other, having lived with plaintiff, had helped him operate the farm; that plaintiff offered to buy the farm for whatever defendant had paid for it as early as April, 1941; that, having gradually learned that he had been executor until the estate was closed and that he himself had actually sold the farm to defendant, he made known to defendant in November, 1943, his claim to the entire farm; that, from November, 1943, until July, 1944, he was unsuccessful in his repeated attempts to employ counsel and that, finally having retained one of his present counsel in July, 1944, the present action was commenced in January, 1945.

The chancellor found that plaintiff neither ratified his quitclaim deed nor delayed an unreasonable time in assert-

ing his rights, and we are not inclined to disturb his findings. Plaintiff's individual quitclaim deed, executed while he was mentally incompetent, was voidable. (*Burnham* v. *Kidwell,* 113 Ill. 425.) Upon regaining his sanity, plaintiff could elect to either ratify or disaffirm. his contract. Ratification, to be binding, need not be express, but may result from words, acts and deeds, and thus be implied in fact. Similarly, a disaffirmance may be either express or implied in fact. Where the contract is fully executed, however, disaffirmance is limited to an express demand that the consideration parted with be returned. Under ordinary circumstances, where the opposite party has dealt with one mentally incompetent in good faith and without knowledge of his insanity, the demand for a rescission, to be effective, must be accompanied by an offer to restore the opposite party to his original position. (*Walton* v. *Malcolm,* 264 Ill. 389; *Scanlan* v. *Cobb,* 85 Ill. 296.) Less commonly, where the contract is entered into in the absence of good faith and with the knowledge of the other's insanity, restoration of the consideration received is not a condition precedent to an effective disaffirmance. (*Jordan* v. *Kirkpatrick,* 251 Ill. 116; *Fecht* v. *Freeman,* 251 Ill. 84.) Furthermore, the disaffirmance must, in any event, be made within a reasonable time after the mental disability has been removed. Stated otherwise, failure to disaffirm within a reasonable time constitutes ratification of the contract.

In the case at bar, defendant derives chief support for his claim of ratification from plaintiff's act of cashing the check representing his distributive share in the estate and from the fact that he did not bring this action until five years after his final discharge from the Manteno State Hospital. While ordinarily each of these circumstances, taken alone, would be sufficient to show ratification, even taken together they do not amount to ratification under the particular facts of the instant case. Defendant's conduct

does much to defeat his assertion of ratification. Although there is no claim of a fiduciary relationship, it must be recognized that plaintiff was defendant's patient when he was first committed to a mental hospital for treatment in January, 1937. It further appears that defendant was not in ignorance of the fact that plaintiff spent the far greater part of the next four years in mental institutions. Notwithstanding plaintiff's immediate medical history, defendant was perfectly willing to purchase from him, as executor, the farm and the 1940 crops for $90 per acre. We observe, parenthetically, defendant's embarrassment when his own valuation witnesses would not place the value of the farm, alone, at less than $100 an acre. Continuing, the record discloses defendant was fully cognizant of the fact that it was necessary to obtain plaintiff's signature to the quitclaim deed at the Manteno State Hospital. Plaintiff was discharged from the hospital December 30, 1940, as improved,—not restored. For all practical purposes, he had lost four years of his life. Never an educated man, he had difficulty in picking up the pattern of events in the probate proceeding. Although he knew the farm had been sold, he did not know the mechanics of the sale, nor did he know he had executed any deeds. In addition, new counsel represented the estate, and plaintiff was still very shy as the result of his recent affliction. His efforts to ascertain the details of the sale of the farm from defendant and the attorney for the estate elicited only evasive answers. On these facts, it cannot be said that plaintiff's acceptance of his check for his distributive share of the estate constituted a ratification of his deed. As held in *Beasley* v. *Beasley,* 180 Ill. 163, ratification of a deed given by a mentally incompetent person can be effected only when it appears that the ratification is the intelligent act of the grantor who, with full knowledge of the conveyance, clearly evinces an intention to abide and be bound by it. While plaintiff knew as early as January, 1941, that defendant had pur-

chased the farm, he had no knowledge that he himself had participated in the sale and had quitclaimed his interest in the farm to defendant. Moreover and in any event, under the facts as related, plaintiff's acceptance of his check did not clearly evince an intention to be bound by the sale.

Although it is true that a disaffirmance of a voidable contract must be made within a reasonable time, the question of what is a reasonable time is controlled by the facts of the particular case. Here, five years was not an unreasonable delay. Plaintiff, upon his discharge from the hospital, was justly fearful of a relapse. In addition, his attempts to learn how defendant acquired the farm were met with evasiveness from both the defendant and the attorney for the estate. There is no showing when, or in what year, plaintiff first became aware that individually and in a representative capacity he had executed deeds to defendant. The entry of two of his sons into military service and the subsequent death of one of them must, likewise, be taken into consideration. Furthermore, land having the characteristics of permanence, immobility and relatively stable value, the period in which a deed may be disaffirmed is somewhat longer than the time allowed for the disaffirmance of other contracts. Lastly, we observe that plaintiff fully apprised defendant of his intention to regain the farm in October, 1943, and that he satisfactorily explained the interval between that date and the date of bringing this action by his difficulties in obtaining counsel. From the record before us, we cannot say that the chancellor's finding that plaintiff was not guilty of unreasonable delay in disaffirming his deed is contrary to the manifest weight of the evidence.

The decree of the circuit court of Kankakee County is affirmed.

*Decree affirmed.*