MY PIE INTERNATIONAL, INC., Plaintiff-Appellant, Plaintiff-Appellee, Cross-Appellant,

v.

DEBOULD, INC., Dowmont, Inc., Arnold Germain and Judith Germain, Defendants-Appellees, Defendants-Appellants, Cross-Appellees.

Nos. 81–2418, 81–2443 and 81–2583.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1982.

Decided Aug. 17, 1982.

Rehearing and Rehearing En Banc Denied Oct. 7, 1982.

---

Charles A. Laff, Laff, Whitesel, Conte & Saret, Chicago, Ill., for My Pie Intern., Inc.

Leon E. Lindenbaum, Walsh, Case, Coale, Brown & Burke, Chicago, Ill., for Debould, Inc., et al.

Before BAUER, ESCHBACH and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The plaintiff in these consolidated actions, My Pie International, Inc., is an Illinois corporation that has franchised a total of 13 restaurants throughout the country. The restaurants sell mainly pizza. Each restaurant operates under the name "My [Greek letter *pi*]," the plaintiff's trademark. The individual defendants are two residents of Illinois who own the corporate defendants, Dowmont, Inc. and Debould, Inc., each of which is a former My Pie franchisee. Dowmont owns a restaurant located in Glen Ellyn, Illinois, a suburb of Chicago. Dowmont operated this restaurant under a My Pie franchise between July 1976 and May 1980, and since then has operated it under the name Arnold's. Debould owned a restaurant in Boulder, Colorado that operated under a My Pie franchise from October 1977 until August 1980 and thereafter (until sold) under the Arnold's name. My Pie brought this suit to recover royalties under and damages for breach of the franchise agreement and also damages for trademark infringement and theft of trade secrets after the termination of the franchises. The defendants counterclaimed for the royalties they had paid My Pie under the franchise agreements. Federal jurisdiction of the suit is conferred by My Pie's trademark infringement claim, based on the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a). All of My Pie's other claims, and the counterclaims, are pendent or ancillary claims based on Illinois law. The district court, after a bench trial, dismissed all of My Pie's claims except for royalties, and also dismissed the defendants' counterclaims. The case is before us on the parties' cross-appeals.

Whenever a franchise relationship is terminated and the franchisee decides to carry on the business in the same place, he must discontinue using his exfranchisor's trademarks and trade secrets. My Pie's only trademark is the name "My [*pi*]." Although the defendants stopped using it when their franchises were terminated, and switched to the name "Arnold's," My Pie

contends that the defendants retained so many of the distinctive features of the My Pie operation that patrons of Arnold's were likely to think that it was still a My Pie franchise—features such as Tiffany-style lamps and a distinctive fireplace and the slogan "unique pizza in the pan." The district court found that these were not distinctive features and that patrons would not be misled. These are findings of fact that we may not set aside unless clearly erroneous. See Fed.R.Civ.P. 52(a). Because My Pie evidently misunderstands the standard of review, and except for a perfunctory obeisance to the clearly-erroneous standard takes issue with the district court's factfindings as erroneous rather than clearly so, most of its argument to us is simply misdirected.

The district court also found as a fact that the defendants had not stolen any of My Pie's trade secrets. Again My Pie makes little effort to show that this finding is not just erroneous but clearly so; again the only issues are factual, and of limited interest. We shall not fill up the pages of the Federal Reporter discussing such questions as whether the ratio of yeast to flour in Arnold's pizza dough was stolen from My Pie or taken out of a cookbook. It is enough to record our conclusion that none of the district court's findings of fact with respect to My Pie's trademark and trade secret claims is clearly erroneous; having done so, we turn to the pretermination issues.

The defendants argue that the franchise agreements were void under Illinois' Franchise Disclosure Act, Ill.Rev.Stat.1981, ch. 121½, §§ 701 et seq. Although this statute has been on the books for more than eight years there has been virtually no judicial interpretation of it, and we must guess how the Illinois courts would resolve several novel questions under the Act.

■ Modeled loosely on the new-issue provisions of federal securities and state blue-sky laws and closely on franchise-disclosure statutes in several other states, the Act seeks to prevent fraudulent and unsound franchise promotions in Illinois by requiring the franchisor to give prospective franchisees extensive and verified written information, in the format prescribed in section 5 of the Act, on the background and resources of the franchisor and its principals, the terms of the franchise relationship, and the franchisor's prospects. See section 2; Rudnick & Ginsburg, *The Illinois Franchise Disclosure Act*, 62 Ill.Bar.J. 256 (1974). Section 4(2) of the Act makes it unlawful to sell a franchise without providing the prospective franchisee with a copy of the disclosure statement specified in section 5 at least seven days prior to the execution of a binding franchise or the receipt by the franchisor of "any consideration," whichever comes first. Any sale of a franchise in violation of the Act is voidable at the election of the franchisee, provided that notice of election to rescind is given by the franchisee to the franchisor within 90 days of the franchisee's first learning of a violation of the Act. §§ 21(2)(a), (b).

Dowmont and Debould first received the required disclosure statement from My Pie on November 30, 1977. This was more than two years after Dowmont had executed its franchise agreement with My Pie. It was also six weeks after Debould had begun doing business as a My Pie franchisee. And though it was more than seven days before Debould's franchise agreement with My Pie was executed, Debould had already paid two invoices for supplies furnished it by My Pie, including menus and employee T-shirts bearing My Pie's trademark; if these payments were "consideration" within the meaning of section 4(2), My Pie's failure to give Debould a copy of the disclosure statement at least seven days before the payments were made was a violation of the Act.

■ We think they were consideration even though they were not a fee for the franchise itself. "Franchise fee" is a term of art carefully defined and frequently invoked in the Act. See sections 3(14), 4.2, 5(10), 5(11), 11. If the draftsmen had meant the running of the seven-day period in section 4(2) to be triggered only by the payment of franchise fees and not by con-

sideration more broadly conceived, probably they would have used the term franchise fee. But more important than this textual point is the fact that franchisors often derive an important part of their franchise income from the sale of incidental supplies to the franchisees. The objective of the Franchise Disclosure Act—to protect uninformed franchisees—would be seriously undermined if the franchisor could collect income in this form from its franchisees indefinitely, without complying with the statutory disclosure requirement, simply by not executing written franchise agreements. We think therefore that the idea behind the reference to consideration in section 4(2) must be that the receipt of franchise-related income by the franchisor is sufficient evidence of a franchise relationship to trigger the statutory disclosure requirement.

My Pie argues in the alternative that it did not have to give Debould a disclosure statement because Debould was merely taking over an existing franchise. We need not consider whether the Act applies to a transfer. There had indeed been another franchisee at the location but there is no evidence that Debould received a copy of that franchisee's disclosure statement, and in any event My Pie purported to sell Debould a new franchise rather than transfer an existing one.

We conclude that My Pie violated the Franchise Disclosure Act with respect to both franchisees, who therefore were entitled to rescind the franchises. But we have still to consider whether they did so within the statutory time limit. Both Dowmont and Debould gave My Pie notice of their election to rescind on February 22, 1980, which was more than 90 days—indeed more than two years—after the alleged violations occurred. They say they did not know about the violations until a conference with their attorney on January 11, 1980, and if so they were within the statutory period for the election even if their attorney knew earlier. See *Brenkman v. Belmont Marketing, Inc.*, 87 Ill.App.3d 1060, 1065, 43 Ill.Dec. 500, 504, 410 N.E.2d 500, 504 (1980). While My Pie is skeptical of this assertion in light of the history of My Pie's relationship with

Dowmont and its principals (about which more presently), My Pie has not proved that the defendants had earlier knowledge of the violations and in its briefs in this court seems willing to assume they did not. Hence the defendants were entitled to rescind the franchises unless they either waived their rights under or are estopped to plead the Franchise Disclosure Act by virtue of certain events in 1975.

On April 4 of that year Dowmont had signed a lease for premises located in Westmont, Illinois, intending to operate a My Pie franchise there. My Pie had not yet registered under the Franchise Disclosure Act and therefore could not lawfully franchise Dowmont. But section 12 of the Act authorizes the Attorney General of Illinois (see section 3(20)) to exempt particular franchise agreements from its requirements on various grounds, including the limited scope of the franchisor's offering; and on April 17 Dowmont applied for an exemption. Using language supplied to it by My Pie, Dowmont stated in the application that it had reviewed the financial statement of My Pie's franchisee in Tulsa, Oklahoma, that it was "satisfied with the information already received from My Pie" and "able to bear the full economic rish [*sic*] of loss of this investment," and that "the receipt of a franchise disclosure statement would not provide the undersigned with any information which has not already been received."

The exemption was granted on May 1, in an order stating that it would expire on December 31, 1975, and that it was "limited to the transaction identified herein," i.e., the sale of a My Pie franchise to be operated in Westmont. The order also stated that "additional solicitations of sales of My Pie franchises must either fall within additional exemptions of The Franchise Disclosure Act or My Pie must otherwise comply with the Act."

There is no contention that the order exempted either Dowmont's franchise in Glen Ellyn (the Westmont project having fallen through), or Debould's franchise in Boulder, from the requirements of the

Franchise Disclosure Act. But the district court held that by disclaiming any wish to have the statutory disclosure statement Dowmont (and by virtue of its common ownership with Debould, Debould as well) had waived its rights under the Act.

■ My Pie does not defend this holding, and could not in light of section 36 of the Act, which provides that "any condition, stipulation or provisions purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void." This provision, especially when read in conjunction with the May 1 order itself, which as we have noted granted an exemption only to the end of 1975 and only for the Westmont project, eliminates any basis for arguing that the defendants waived their rights under a statute whose purpose is to protect prospective franchisees from the consequences of their ignorance by requiring franchisors to give them detailed written information. That purpose would be subverted if the franchisor could get a permanent exemption from the Act by inducing a prospective franchisee to obtain a limited exemption, especially in a case such as this where the exemption was based on the limited scope of the franchisor's offering rather than on a judgment by the Attorney General that the franchisees had all the information they needed without getting a disclosure statement. An express written waiver of the defendants' rights under the Act would have been ineffective; the weaker statement that they did not need the information that they would have received in the statutory disclosure statement cannot have any greater effect.

■ Rather than defending the district court's holding that there was a waiver, My Pie argues that the defendants are estopped to plead the Act by the events surrounding the exemption proceeding. So far as we can tell this argument was first made on appeal, which is much too late. Rule 8(c) of the Federal Rules of Civil Procedure provides that, "In pleading to a preceding pleading, a party shall set forth affirmatively . . . estoppel," and My Pie failed to do so here. Since Illinois law contains the same requirement, see Ill.Rev.Stat.1981, ch. 110, § 2–613(d); *Hartford Accident & Indem. Co. v. D.F. Bast, Inc.*, 56 Ill.App.3d 960, 962, 14 Ill.Dec. 550, 372 N.E.2d 829, 832 (1978), we need not consider whether, under the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this pleading requirement expresses a substantive state policy (reluctance to allow legal rights to be nullified by equitable defenses) that would be binding on a federal court in a suit under state law even if the Federal Rules of Civil Procedure did not impose the same requirement.

Even if estoppel had been pleaded, My Pie would have a further threshold to cross: it would have to convince us that the defense of estoppel is available in a Franchise Disclosure Act case. A case from North Dakota, *Peck of Chehalis, Inc. v. C. K. of Western America, Inc.*, 304 N.W.2d 91, 98–100 (N.D.1981), holds that estoppel is a defense to an action for rescission under North Dakota's counterpart to the Illinois Franchise Disclosure Act. But the court thought it significant that North Dakota's act merely authorized an action for rescission and did not, as Illinois' act does, make a noncomplying franchise sale voidable. See *id.* at 98–99; see also *Country Kitchen of Mount Vernon, Inc. v. Country Kitchen of Western America, Inc.*, 293 N.W.2d 118 (N.D.1980). And *Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc.*, 308 N.W.2d 490, 494 (Minn.1981), implies, contrary to the North Dakota cases, that there is no defense of estoppel even if the franchise disclosure statute does not make a noncomplying franchise sale voidable.

■ In any event the factual basis for an estoppel under Illinois law has not been made out in this case. An estoppel requires conduct or a representation that induces good-faith detrimental reliance. See, e.g., *Terracom Dev. Group, Inc. v. Coleman Cable & Wire Co.*, 50 Ill.App.3d 739, 747, 8 Ill.Dec. 642, 648, 365 N.E.2d 1028, 1034 (1977). Here that would mean that in applying for and receiving an exemption Dowmont had misled My Pie into thinking that it would never have to send Dowmont or

Debould the disclosure statement required by the Act. The record does not contain an adequate factual basis for such a finding. It is not as if Dowmont had received a copy of the disclosure statement in connection with the Westmont project. If it had, My Pie would not have been required to give Dowmont a second statement in connection with the Glen Ellyn franchise unless the statement had been amended in the interim. See section 12 of the Act. By applying for an exemption Dowmont indicated, at most, that it was willing to wait till the end of the year, when the exemption would expire, to receive the required statement—not that it was willing to wait forever. The Westmont project, as we have said, fell through and Dowmont did not begin operating under the Glen Ellyn franchise until 1976. At that time it had no reason to think that My Pie was not subject to the requirements of the Franchise Disclosure Act, since the exemption had expired and had in any event been limited to Westmont.

Since the franchise agreements were voidable and voided, My Pie had no rights under them, see *Brenkman v. Belmont Marketing, Inc., supra,* 87 Ill.App.3d at 1065, 43 Ill.Dec. at 510, 410 N.E.2d at 505; *Broverman v. City of Taylorville,* 64 Ill.App.3d 522, 527, 21 Ill.Dec. 264, 267, 381 N.E.2d 373, 376 (1978), and hence cannot obtain royalties or damages based on the agreements. We therefore need not consider the other defenses (unconscionability, unreasonableness of restrictive covenants, and noncompliance with contractual conditions) that Dowmont and Debould have raised to My Pie's suit. And we need not consider what rights, if any, My Pie might have under a theory of quantum meruit or unjust enrichment, analogous to the rights of a party to a contract that is unenforceable because it violates the Statute of Frauds. My Pie has not asserted any such rights; its pretermination claims are based exclusively on the franchise agreements that we have held are void.

All that remains to be considered is Debould's counterclaim for the royalties that it paid My Pie before rescission. The district court held that both Debould's counterclaim and Dowmont's similar counterclaim were barred by the statute of limitations, but only Debould has appealed from that determination. Section 22 of the Franchise Disclosure Act provides that "no action shall be maintained to enforce any liability created under this Act unless brought before the expiration of 3 years after the act or transaction constituting the violation, the expiration of one year after the discovery of the fact constituting the violation or 90 days after delivery to the franchisee … of a written notice disclosing the violation." Debould's counterclaim was filed on April 10, 1981, which was more than three years after the violation (the failure to furnish Debould with a timely disclosure statement) and more than one year after Debould's discovery of the violation on January 11, 1980. But My Pie's lawsuit in which the counterclaim was filed had been brought on August 18, 1980, within the three-year limitations period applicable to Debould's claim; and Ill.Rev.Stat. ch. 83, § 17 (now ch. 110, § 13–207) allows a defendant to plead a time-barred counterclaim so long as the plaintiff's cause of action was "owned" by the plaintiff before the expiration of the statute of limitations. My Pie's cause of action for royalties must have been "owned" by My Pie before its suit to recover them was brought, i.e., before August 18, 1980.

There is, though, authority for the proposition that section 17 does not extend the time for filing a claim barred by a limitations period contained in the very statute creating the cause of action. The idea is that the expiration of such a period extinguishes the right, rather than just the remedy, so there is no claim for section 17 to work on. See cases cited in *Wood Acceptance Co. v. King,* 18 Ill.App.3d 149, 151–52, 309 N.E.2d 403, 404–05 (1974). This rather wooden reasoning was rejected in the *Wood* case, which held that a counterclaim under the Truth in Lending Act could be maintained under section 17 even though the one-year limitations period in the Act had run. The court was persuaded that

since the Act was passed in the interest of the "unknowledgeable consumer," 18 Ill. App.3d at 151, 309 N.E.2d at 405, Congress would have wanted him to have the benefit of section 17 if it had thought about the point. Persuasive or not, that reasoning carries over to the present case, perhaps with even greater force since the Franchise Disclosure Act is an Illinois rather than federal statute. The Act was passed in the interest of the unknowledgeable franchisee (the "beguiled franchisee," the court called him in *Brenkman, supra*, 87 Ill.App.3d at 1065, 43 Ill.Dec. at 505, 410 N.E.2d at 505); and applying the reasoning of the *Wood* case we conclude that the legislature if it had adverted to the point would probably have decided that the franchisee should have the benefit of section 17 notwithstanding the inclusion of a limitations period in the Act. See also *Helle v. Brush*, 53 Ill.2d 405, 292 N.E.2d 372 (1973); *National Blvd. Bank of Chicago v. Thompson*, 85 Ill.App.3d 1145, 41 Ill.Dec. 241, 407 N.E.2d 739 (1980).

It is true that the general statute of limitations in Illinois that would apply to cases under the Franchise Disclosure Act if the Act did not have its own limitations period is five years, Ill.Rev.Stat. ch. 83, § 16 (now ch. 110, § 13–205). This suggests that the draftsmen of the Franchise Disclosure Act may have wanted a shorter than normal period, and among the rejected norms may have been that of section 17. But the same point could have been made in *Wood*, since the limitations period in the Truth in Lending Act was only one year; it was not made, and we cannot see how the court that decided *Wood* could have distinguished this case.

■ It follows that Debould's counterclaim for the royalties it paid My Pie under a franchise agreement that Debould had rescinded was not time-barred and must be reinstated. Section 21(1) of the Franchise Disclosure Act authorizes damages actions for violations of the Act, and section 21(2) allows a rescinding franchisee to get back the "full amount paid" for the franchise. We need not decide whether or to what extent these sections authorize the recovery of royalties. The extent of Debould's right to recover under its counterclaim is not discussed in the briefs in this court or in the opinion below, and we think it is an issue for the district court to consider, in the first instance at least, on remand.

The judgment of the district court is reversed insofar as it awards royalties to My Pie, dismisses Debould's counterclaim, and orders the dismissal of a parallel action brought by Debould in state court; and is otherwise affirmed. The case is remanded to the district court for dismissal of My Pie's complaint in its entirety and for further proceedings, consistent with this opinion, on Debould's counterclaim. My Pie shall bear all costs in this court.

So Ordered.

ESCHBACH, Circuit Judge, concurring in part and dissenting in part.

While I concur in the majority's affirmance of the district court's judgment on the trademark infringement and trade secrets issues, I respectfully dissent from the majority's conclusion that defendants are entitled to rescind their contracts and that Debould is entitled to prevail on its counterclaim by virtue of the Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½, §§ 701–40 (1981).

*Facts*

In the latter part of 1974 and early 1975, two sophisticated businessmen, Germain and Beadle, became interested in opening a My Pie restaurant and scouted potential locations in the western suburbs of Chicago, Illinois. Germain and Beadle were friends of Aronson, president of My Pie International, Inc., and had discussed with him the possibility of obtaining a My Pie franchise. In the spring of 1975, Germain and Beadle found what they believed to be a suitable location for operating a My Pie restaurant in Westmont, Illinois, and Aronson, after inspecting the site, told Germain and Beadle that the location would be an appropriate one. Germain and Beadle executed a lease agreement for the Westmont property on April 4, 1975, with the assistance of their

attorney, Schwartz. The next day, they gave Aronson a check for $10,000 for the purchase of restaurant supplies. The money was part of a $90,000 loan the two had secured, mostly on Beadle's credit. (The loan was later repaid and the restaurant supplies used in the My Pie restaurant they ultimately opened.) Sometime during March or April of 1975, Germain and Beadle, who had been acting as partners or perhaps joint venturers regarding the prospective My Pie franchise, formed Dowmont, Inc., a closely held corporation; the incorporation was handled by their attorney, Schwartz.

An attorney representing My Pie during this period, Salzman, testified that he spoke with Schwartz during April concerning the proposed franchise. Salzman testified that he informed Schwartz about the Illinois Franchise Disclosure Act, and indicated that My Pie would seek an exemption from the provisions of the Act. According to Salzman, he mailed a copy of the proposed franchise agreement to Schwartz along with a draft of a letter, to be executed by Dowmont (*i.e.*, Germain and Beadle), requesting an exemption from the Secretary of State. Salzman later obtained the exemption letter executed by Dowmont, with Schwartz' name written in at the bottom, and sent it to the Secretary of State together with My Pie's request for an exemption. While Salzman stated his belief that he had received the Dowmont exemption request letter from Schwartz' office, he admitted it was possible that Aronson had given it to him, but thought that was highly improbable.

Germain testified that he had obtained a copy of the draft exemption request letter from Aronson on a Chicago streetcorner, and maintained that neither he, nor Beadle to his knowledge, had discussed it with Schwartz. He did admit reading the draft, and having a copy prepared which he signed. He also admitted that whoever wrote in Schwartz' name on the document did so in his presence and with his knowledge. Germain denied, however, ever discussing the proposed franchise agreement with Schwartz, and also denied having been informed about the Illinois Franchise Disclosure Act.

Beadle, on the other hand, testified that both Germain and Aronson had informed him that an exemption from the Act was required due to the financial disclosure statement requirement. He also maintained that he had met with Germain, Aronson, and Schwartz, in Schwartz' office, and discussed the franchise agreement in April.

The letter from Dowmont to the Secretary of State, mailed in mid-April, 1975, stated:

Please be advised that the undersigned has approached My Pie International, Inc. ("My Pie") with the intention of offering to purchase a franchise operation from My Pie. My Pie has informed the undersigned that it has not filed a franchise disclosure statement and, therefor, cannot enter into a franchise agreement without an exemption from the Franchise Disclosure Act. This letter, which is attached to My Pie's request for an exemption, is to serve as a request upon you to grant an exemption from said Act and to serve as an explanation and the reasons for this request.

The undersigned has reviewed the proposed franchise agreement with its own independent counsel, has reviewed the financial statements of the franchise operation located in Tulsa, Oklahoma, has had the opportunity to view the operation of My Pie in Chicago, and is able to bear the full economic ris[k] of loss of this investment.

The undersigned is satisfied with the information already received from My Pie and is of the opinion that the receipt of a franchise disclosure statement would not provide the undersigned with any information which has not already been received.

Additionally, the undersigned feels that it is important to inform you that it has already leased the premises in which it intends to do business and has commenced purchasing restaurant equipment

although My Pie has advised against such actions and has consistently refused to execute a franchise agreement unless and until the Secretary of State grants the exemption requested. In light of the above and foregoing, we would appreciate an early response to this request.

Should you have any questions, please feel free to call the undersigned or its counsel.

Shortly after this was mailed, Germain and Beadle executed the franchise agreement, dated May 1, 1975. The Secretary of State granted the exemption for the Dowmont franchise (and an exemption for another franchise), effective May 1, 1975, in the following language:

ORDER EXEMPTING A FRANCHISE FROM SECTION 4 OF "THE FRANCHISE DISCLOSURE ACT" OF ILLINOIS PURSUANT TO SECTION 12 OF THE ACT.

    \*    \*    \*    \*    \*    \*

2. My Pie has been approached by Dowmont, Inc. 1406 Sixty-Second Street, Downers Grove, Illinois 60515, and WEPO, Inc., the shareholders of which are Illinois citizens, regarding the purchase of franchises in Minnesota and Westment [sic], Illinois, respectively. Each of the respective parties has represented to My Pie that he is a sophisticated investor, has made a full and complete independent investigation of the franchise operation, has had the advice of independent counsel, and has reviewed the financial statements of the Oklahoma franchise.

3. Dowmont, Inc. through William T. Beadle and Arnold E. Germain, indicates it takes no objection to the issuance of this order.

    \*    \*    \*    \*    \*    \*

THEREFORE, IT IS HEREBY ORDERED: That in view of the foregoing, My Pie International, Inc. is exempt from Section 4 of The Franchise Disclosure Act of Illinois due to the limited character of the offering, such [sic] to the following condition:

The exemption provided by this order is limited to the transaction identified herein. Additional solicitations or sales of My Pie franchises must either fall within additional exemptions of The Franchise Disclosure Act or My Pie must otherwise comply with the Act. This order will expire on December 31, 1975 unless revoked, amended or further conditioned by the Secretary of State prior to the expiration date.

EFFECTIVE DATE OF THIS ORDER: The 1st day of May, 1975.

Germain claimed that he was never informed (prior to this litigation) that the exemption was granted. Beadle testified that both Aronson and Germain had advised him about the granting of the exemption. Salzman, the attorney for My Pie, testified that a copy of the letter which he sent to Aronson advising him of the granting of the exemption was sent to Schwartz.

In any event, the exemption was granted, and My Pie executed the Dowmont franchise agreement. A contract was formed May 1, 1975, and Dowmont was a My Pie franchisee. In July 1975, however, Germain and Beadle learned a distressing fact: the leasehold interest which they had in the site at Westmont, where they had intended to exercise their franchise, had been divested. (It appears that the lease had not been recorded, and the property had been transferred to a good faith purchaser for value without notice.) The franchisee obviously had to find another suitable site for a restaurant, and in September, found one in Glen Ellyn, a nearby Chicago suburb. Aronson indicated that the Glen Ellyn site was a suitable one, and Dowmont proceeded to make appropriate arrangements for opening a My Pie restaurant at that location. Attorney Schwartz once again arranged for the lease at the Glen Ellyn site on behalf of Dowmont. In the spring of 1976, the Dowmont franchise agreement was finally altered to reflect the change of address from Westmont to Glen Ellyn; no other changes whatsoever were viewed as being necessary by the parties, and no other changes were made.

The Dowmont operation was sufficiently successful, at least from the perspective of its principals, Germain and Beadle, that the two purchased the facilities of another My Pie franchisee in Boulder, Colorado, with the intent of operating a My Pie restaurant at that location. In fact, they operated a My Pie restaurant at that location beginning in October, 1977, and purchased some supplies for it from My Pie at that time, but did not execute a franchise agreement with My Pie until the following year, though the agreement was dated October 17, 1977. Germain and Beadle formed another closely held corporation, Debould, Inc. to operate the Boulder restaurant.

On November 30, 1977, Aronson gave Germain a copy of My Pie's financial disclosure statement, dated March 7, 1977, which My Pie had prepared for prospective franchisees in order to meet the requirements of the Illinois Franchise Disclosure Act. The cover page of the disclosure statement contained the following language:

\*   \*   \*   \*   \*   \*

THIS OFFERING CIRCULAR IS PROVIDED FOR YOUR OWN PROTECTION AND CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THIS OFFERING CIRCULAR AND ALL CONTRACTS OR AGREEMENTS SHOULD BE READ CAREFULLY IN THEIR ENTIRETY FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.

\*   \*   \*   \*   \*   \*

THE ILLINOIS FRANCHISE DISCLOSURE ACT MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WHICH IS SUBJECT TO REGISTRATION WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, AT LEAST SEVEN (7) DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN (7) DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE, WHICHEVER OCCURS FIRST, A COPY OF THE OFFERING CIRCULAR, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE FRANCHISE.

Pursuant to their respective contracts, Dowmont and Debould paid My Pie royalties as consideration for their franchises to operate restaurants serving My Pie pizza and other items. Debould ceased paying royalties in March 1979; Dowmont stopped payments in December 1979. Germain explained the reasons for the defaults was that he could not afford the royalties. Both restaurants continued to operate as My Pies.

On January 8, 1980, My Pie sent notices of default to both franchisees; both responded with notices of rescission, dated February 22, 1980, invoking the provisions of the Illinois Franchise Disclosure Act. No longer represented by attorney Schwartz, but by a new counsel, the franchisees' notices of rescission asserted that Germain did not have knowledge of the purported violation of the Act forming the basis of the rescission, *to wit*, the failure to provide Germain with a timely franchise disclosure statement, until he met with the new counsel on January 11, 1980. Shortly after My Pie received the notices of rescission, litigation ensued, Debould sold the Boulder restaurant, My Pie terminated the franchises (attempting to invoke an option to purchase pursuant to the franchise agreements), and the Dowmont and Debould restaurants ceased doing business as My Pie franchises.

*Illinois Franchise Disclosure Act*

The primary purpose of the Illinois Franchise Disclosure Act is "to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered for sale ...." Ill.Rev.Stat. ch. 121½, § 702(2)(a) (1981). The Act attempts to effectuate this purpose by declaring it

unlawful for any person to offer or sell in this state any franchise which is subject to this Act without first providing to the prospective franchisee or subfranchisor, at least 7 days prior to the execution by the prospective franchisee or subfranchisor of any binding franchise or other agreement, or at least 7 days prior to the receipt by such person of any consideration, whichever occurs first, a copy of an effective disclosure statement registered with the Administrator meeting the requirements of the Act, together with a copy of all proposed agreements relating to the sale of a franchise.

*Id.* § 704(2). Moreover, franchisors are required to be registered with the Illinois Attorney General. *Id.* §§ 703(20), 704(1), and 716. Violation of these requirements of the Act, among others, subjects franchisors to criminal and civil penalties, *id.* §§ 718–20, as well as private civil actions instituted by franchisees, *id.* § 721. Recognizing, however, that situations may arise in which the disclosure and registration requirements of the Act would be unnecessary to assist a prospective franchisee in making an intelligent decision concerning a franchise being offered for sale, the Act empowers state administrators to issue exemptions from these requirements in appropriate cases. *Id.* § 712.

### The Dowmont Franchise

#### The Effect of the Exemption Order

Initially, I disagree with the majority's position that the issue of the applicability of the exemption to the Dowmont franchise is not before us. The district court, after stating that Germain and Beadle had requested an exemption and that the Secretary of State issued such exemption, held: "Accordingly, ... Dowmont, Inc. *effectively* waived any right they had under said statute." (emphasis added). Its choice of the word "waived" was inapt, in light of section 36 of the Act, which declares void "any condition, stipulation or provisions purporting to bind any person acquiring any franchise to waive compliance with any provisions of th[e] Act ...." Ill.Rev.Stat.

ch. 121½, § 736 (1981). In view of this language, however, it is plain to me that the district judge was not holding that defendants had "waived" their protections in the sense expressly prohibited by the statute, but rather, was holding that defendants had obtained a valid exemption and by doing so, "waived," that is, voluntarily relinquished through proper channels, their rights under the Act, (*i.e.*, the exemption was effective to extinguish their rights.) "Waiver is a term that is used by courts and attorneys to refer to a variety of legal principles." *33 Flavors of Greater Delaware, Inc. v. Bresler's 33 Flavors, Inc.*, 475 F.Supp. 217, 229 (D.Del.1979). While the district court might have been more precise in its meaning, it is the district court's judgment, not its word choice, which is on appeal in this case, and the judgment of the district court is clear: that the Dowmont franchise agreement was not voidable under the Act. If that judgment can be sustained on any ground, we are obliged to do so.

It is important to recognize that the exemption order issued regarding the Dowmont franchise performed two discrete functions: first, it exempted My Pie from the registration provisions of § 4(1) of the Act, Ill.Rev.Stat. ch. 121½, § 704(1) (1981), and second, it exempted My Pie from the financial disclosure statement requirement of § 4(2) of the Act, Ill.Rev.Stat. ch. 121½, § 704(2) (1981). While the exemption order is hardly a model of reasoned analysis (nor would one expect it to be), it appears plain to me that the reason for the exemption from the registration provisions was the "limited character of the offering," *i.e.*, My Pie was seeking to franchise only two restaurants. The primary reason, however, for granting the exemption from the financial disclosure statement requirement was that the prospective franchisees (each of whom, *the order recited*, represented himself as a "sophisticated investor" who, with advice of counsel, had made a "full and complete investigation of the franchise operation" and had reviewed financial statements of a current franchisee) did not need to have the benefits of a formal financial

disclosure statement in order to make an intelligent decision concerning the limited purchase. In short, it was the character of the offering which was the basis of the registration exemption, and the character of the offerees which was the basis of the financial disclosure statement exemption. Dowmont wanted to purchase a franchise from My Pie to operate a single restaurant, and in the Secretary of State's view, Dowmont and My Pie would be permitted to enter into a franchise agreement without the necessity of My Pie providing Dowmont a financial disclosure statement. Of course, the exemption was limited to the transactions for which My Pie had requested exemption; if My Pie wished to sell additional franchises, to Dowmont or anyone else, it either would have to register and provide prospective franchisees with disclosure statements or would have to obtain additional exemptions. Moreover, the exemption expired by its terms on December 31, 1975. Thus, if Dowmont and My Pie failed to enter into a contract by the end of the year, in order for My Pie to sell the franchise to Dowmont it would either have to register and provide Dowmont with a disclosure statement, or obtain a new exemption.

While the exemption was in effect, Dowmont and My Pie entered into the franchise agreement. The moment that contract came into existence, Dowmont possessed a franchise, that is, a license from My Pie to sell its products using the trademark My Pie. It was not an exclusive franchise (there were other My Pie franchisees) and it only entitled Dowmont to operate one My Pie restaurant. Indeed, Dowmont could exercise its franchise only at a particular address in Westmont, Illinois, where Germain and Beadle had leased premises for this purpose. When Germain and Beadle were divested of their leasehold in Westmont because of the failure to record the lease, Dowmont did not lose its franchise. It retained the legal right, *vis-à-vis* My Pie, the franchisor, to operate a My Pie restaurant and if it could have obtained the Westmont property from the bona fide purchaser who had divested the leasehold, its franchise was valuable to it. If it could not obtain the property, the franchise was a liability: Dowmont had obligations under the franchise agreement which it could not perform without obtaining the Westmont property. When confronted with this circumstance, Dowmont did not attempt to rescind the franchise agreement on grounds of frustration of purpose or mutual mistake; instead, Germain and Beadle, to extricate themselves from the situation, went to Aronson and informed him of their predicament, and then with his approval proceeded to locate another suitable location in which to exercise their franchise.

In my view, Dowmont purchased only one My Pie franchise, it entered into only one franchise agreement with My Pie, there was only one transaction, and the exemption obtained from the Secretary of State was applicable to that transaction. The address of the prospective My Pie restaurant to be operated by Dowmont was not specified in the order exempting the Dowmont franchise from the registration and disclosure requirements of the Illinois Franchise Disclosure Act; the order merely indicated, for purposes of identification, the name of the town in which Dowmont intended to exercise the franchise, and the order misspelled the name of the town at that. The parties, by mutual agreement, decided upon a different location, and I perceive nothing in the exemption provisions, or the exemption granted, which prevented them from doing so. Given the bases of the exemption from both the registration and disclosure statement requirements, no purpose would have been served by applying for another exemption with respect to this transaction: the Secretary of State's function under the Act is not to process change of address forms.

In light of the majority's view of this case, it obviously would have been prudent for My Pie to obtain a second exemption, or, perhaps an amendment to the exemption order, before agreeing to the change of address. The majority's discussion of this issue, however, rests on a misunderstanding of the purpose and effect of the exemption which My Pie obtained.

The majority's basic misunderstanding of the exemption provisions is illustrated by its position that the exemption order operated to excuse My Pie's failure to provide Dowmont with a disclosure statement only until December 31, 1975, when the order expired. Thus, in the majority's view, My Pie was obligated to provide Dowmont with a disclosure statement after the franchise agreement became effective. This position ignores the language and purpose of the disclosure statement and corresponding exemption provisions. The function of the disclosure statement is to provide information to the *prospective* franchisee a week prior to execution of a franchise agreement, so that he may intelligently decide whether to agree to the contract. The only function of an exemption from the disclosure statement requirement is to permit the prospective franchisee to enter a franchise agreement without the benefit of such a statement. Once the exemption is granted and the contractual obligations are assumed by the franchisee, there is plainly no longer any duty upon the franchisor to provide the franchisee with a disclosure statement, nor would it make any sense to impose such a requirement given the purpose of the disclosure statement.

The significance the majority attaches to the exemption order's recitation of the location of the Dowmont franchise also is unwarranted in view of the purpose of the exemption. The rationale of the exemption order had nothing to do with the precise location in which the franchisee would conduct its business. The location was not a factor in assessing the limited character of the offering nor was the location relevant to a consideration of whether the prospective franchisee was sufficiently sophisticated, and had made adequate independent inquiries about the franchisor's operations, to make compliance with the disclosure provisions unnecessary. Since the majority reads so much significance into the exemption order's mention of the town in which Dowmont intended to exercise its franchise, perhaps if Dowmont had managed to obtain another location in Westmont (or perhaps Westmont, if there is such a place), the majority would consider the exemption order applicable. On the other hand, perhaps the majority would have required the parties to go through the formality of obtaining a new exemption even if the franchisee moved his operations from one floor in a building to another.

Of course, the location of the restaurant was of importance to the parties, and in one sense, all that Dowmont possessed upon execution of the May 1, 1975 franchise agreement was a license to operate a My Pie restaurant *in Westmont*; it was not franchised to operate anywhere else, including Glen Ellyn. In the same sense, when the parties mutually agreed to substitute the Glen Ellyn location, Dowmont relinquished its Westmont franchise in exchange for a franchise to operate in Glen Ellyn. Thus, if one equates a franchise with its location, and further equates the franchise so conceived with the "transaction" for which Dowmont and My Pie obtained the exemption, then one concludes, as does the majority, that the exemption was applicable only to the "Westmont franchise" and inapplicable to the "Glen Ellyn franchise."

I think it is manifest on this record that the parties never intended that Dowmont would operate two My Pie restaurants, one in each location. While in one legal sense Dowmont did obtain two separate "franchises," if the term franchise is used in its basic sense to denote a license to use another's trademark, I do not believe that this characterization of what transpired is appropriate under the Illinois Franchise Disclosure Act.

Section 3(1) of the Illinois Franchise Disclosure Act defines the term franchise as a "contract or agreement . . . by which . . . a franchisee is granted the right to engage in the business of . . . selling . . . goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and . . . the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark . . . ." Ill. Rev.Stat. ch. 121½, § 103(1) (1981). A franchise, under the Act, is a contract—an

elaborate agreement—and not merely a license from a trademark holder permitting another to market a product under that name. *See generally* Black's Law Dictionary, 592 (5th Ed. 1979). The Act is designed to protect prospective franchisees from improvidently entering into such an elaborate agreement without being fully informed as to the nature of the franchisor-franchisee relationship contemplated by the agreement. Because the modern franchise is no longer a mere license, but instead a complex package of mutual rights and duties, the registration and disclosure requirements of the Act have been interposed as a prophylactic to protect prospective franchisees from purchasing unfair or unworkable packages. Armed with the information about the quality of the package, and the packager, the prospective franchisee may make an intelligent decision about becoming a franchisee.

Viewing the facts of this case from this perspective, it is clear that the remedial purposes of the Act were fully served by the exemption that was obtained with respect to the Dowmont franchise. My Pie was not attempting to sell Dowmont a second franchise in Glen Ellyn, it was merely attempting to permit Dowmont to salvage the franchise it possessed by agreeing to a change of address. The contract was identical, except for the lining-out of the Westmont address and the substitution of the Glen Ellyn address, and Dowmont was still armed with the same information which it had obtained about My Pie and which formed the basis of the exemption. Indeed, it is unrealistic on this record to even suppose that Dowmont reconsidered the contractual package represented by the May 1, 1975 agreement after it lost its property in Westmont—it had agreed to that package and there is nothing in this record which supports the position that the precise location of the restaurant influenced the nature of the contractual terms. To the contrary, no changes in the package were discussed or made. The exemption order applied to the transaction represented by the May 1 franchise, and that franchise was unaltered in any way that is relevant to the remedial purposes of the Illinois Franchise Disclosure Act.

### Dowmont is Estopped from Asserting a Violation of the Illinois Franchise Disclosure Act

At the outset, I disagree with the majority that My Pie is not permitted to raise its estoppel arguments on appeal. First, defendants pleaded the provisions of the Illinois Franchise Disclosure Act both as an affirmative defense and as a counterclaim. Estoppel does not need to be pleaded specifically as a reply to an affirmative defense. *Irwin v. West End Development Co.*, 481 F.2d 34, 39 (10th Cir. 1973), *cert. denied sub nom., Vroom v. Irwin*, 414 U.S. 1158, 94 S.Ct. 915, 39 L.Ed.2d 110 (1974). Second, my examination of the record convinces me that the issue of estoppel was tried by the implied consent of the parties, and thus the issue may be treated as having been raised by the pleadings, *id.* Third, defendants do not argue in this court that plaintiff waived its right to argue estoppel, and instead litigate the issue on the merits. Under such circumstances, it is inappropriate for this court to search the record for technical violations of the pleading rules.

Moreover, notwithstanding the majority's brief discussion of caselaw from North Dakota and Minnesota, I think it is clear that a party may be estopped to assert a violation of the Illinois Franchise Disclosure Act. The distinction which the majority points to in support of its uncertainty on this question—a purported distinction between authorizing an action for rescission and making a contract voidable—escapes me. Under Illinois law, and the common law for that matter, a voidable contract is voided through rescission. *E.g., Farmers Automobile Insurance Association v. Pursley*, 130 Ill.App.2d 980, 985, 267 N.E.2d 734, 737–38 (1971) ("When a party seeks, because of misrepresentation or any other ground, to declare an agreement void from its inception ..., it is generally referred to as rescission.") Perhaps the cases relied upon by the majority were confusing void contracts with voidable ones. *See generally* Restate-

ment (Second) of Contracts, § 7 (1981); 1 Corbin on Contracts, §§ 6, 7 (1963). In any event, estoppel is available to a party to defend a rescission action regarding a contract made voidable at common law, and I see no reason it should be unavailable with respect to contracts made voidable by statute. Legislation is enacted against the backdrop of the common law, and here, the legislature's use of the term voidable carries with it the baggage of the traditional defenses associated with that term in the absence of some indication of legislative intent to the contrary. I perceive no such intent here.

Estoppel is as old as equity and as flexible as the circumstances demand. It is not a license for judicial disregard of the will of the legislature, but it is a powerful tool to obviate the harsh results which arise from the mechanical application of general rules to circumstances not even contemplated by legislators.

Under the circumstances of this case, Dowmont should be estopped from asserting its rights under the Illinois Franchise Disclosure Act. By applying for and then receiving the exemption, and by agreeing to the change in location which was necessitated by its own conduct, Dowmont placed My Pie in a position whereby My Pie could justifiably believe that it would never have to provide Dowmont with a financial disclosure statement. The majority's analysis of the question is based on the erroneous assumption that by applying for the exemption, "Dowmont indicated only that it was willing to wait until the end of the year, when the exemption would expire, to receive the required statement—not that it was willing to wait forever." For reasons which I have already explained, the notion that Dowmont was entitled to a disclosure statement once the exemption expired represents a basic misunderstanding of the purpose of the disclosure statement and the effect of the exemption obtained. By applying for and obtaining the exemption, Dowmont was indeed indicating that My Pie would never have to provide it with a disclosure statement pertaining to the May 1, 1975 franchise agreement. Even if, as a

matter of law, the exemption technically was not applicable to that agreement once the change of address occurred, My Pie was justified in believing that Dowmont would not assert that hypertechnical violation given Dowmont's agreement to the change in address and the reason that change of address was required. My Pie changed its position—permitting Dowmont to locate elsewhere—in reliance on Dowmont's good faith concerning the loss of the Westmont property, and it is almost inconceivable to me that Dowmont should now be permitted to rescind the agreement on the ground of a change in the franchise agreement necessitated by its own lack of diligence.

### Dowmont's Ratification of its Contract with My Pie

Section 21(2) of the Illinois Franchise Disclosure Act provides that any sale of a franchise in violation of the Act "shall be voidable at the election of the franchisee" provided that "[n]otice of [the] election" is given to the franchisor within 90 days after the franchisee has "knowledge of a violation" of the Act. Ill.Rev.Stat. ch. 121½, § 721(2) (1981). The statute thus recognizes the common law characteristics of a voidable contract: that one empowered to rescind a contract and declare it void from its inception may decide to do otherwise, but that one seeking to rescind a transaction "must elect to do so promptly" after learning of the basis for the rescission, "must announce his purpose and must adhere to it." Farmers Automobile Insurance Association v. Pursley, supra, 130 Ill.App.2d at 885–86, 267 N.E.2d at 738.

One may expressly ratify a voidable contract; however, "[r]atification, to be binding, need not be express, but may result from words, acts and deeds, and thus be implied in fact." Brandt v. Phipps, 398 Ill. 296, 315, 75 N.E.2d 757, 760 (1947). Indeed, a failure to make the election, a "failure to disaffirm within a reasonable period of time constitutes ratification of the contract." Id. For example, "where a party desires to rescind a contract upon the ground of fraud, he must, upon the discovery of the

fact, at once announce his purpose and adhere to it .... 'He is not permitted to play fast and loose.'" *Guhl v. Guhl*, 376 Ill. 100, 33 N.E.2d 185, 188 (1941). Moreover, "it is not necessary to a binding ratification that the party sought to be charged knew at the time of the act that he had the legal right to avoid the contract." *Shepherd v. Shepherd*, 408 Ill. 364, 376, 97 N.E.2d 273, 279 (1951). Of course, in the case of fraud, or in the case of a violation of the Illinois Franchise Disclosure Act (such violation in effect being deemed a constructive fraud by the legislature), a ratification will not be inferred from the party's inaction until he has knowledge of the fraud or violation.

In the instant case, the Illinois legislature has determined that 90 days is a reasonable time in which to permit a franchisee to make an election. If he fails to do so within that time, he is irrebuttably presumed to have ratified the franchise agreement. The key question in this case, of course, is when did Dowmont have knowledge of My Pie's putative violation of the disclosure statement provision. The district court made no finding of fact on this question. The majority takes the position that My Pie did not disprove Germain's representation that he only learned of the violation in January 1980. It is true—and hardly surprising—that the only direct testimony concerning Germain's mental state came from Germain himself. Needless to say, however, that self-serving statement of a legal conclusion by Germain is hardly dispositive. As recognized in *Brenkman v. Belmont Marketing, Inc.*, 87 Ill.App.3d 1060, 43 Ill.Dec. 500, 410 N.E.2d 500 (1980), relied upon by the majority, knowledge of a statutory violation is indeed a mixed question of law and fact. In order for one to realize that a violation of a statute has occurred, one must have the rudimentary ability to conceptualize a legal rule (of which, of course, he must be aware), and make a determination as to whether a certain act or omission (again, of which he must be aware) is inconsistent with that rule. Direct evidence concerning such knowledge is likely to be inconclusive at best, and suspect at worst. In this case, there is no question

that Germain (not to mention Beadle, whom the majority fails to mention) knew the legal rule, and knew he had not received a timely disclosure statement, at least as early as 1977, and probably as early as 1975. Irrespective of which party has the burden of persuasion on this matter (and I would submit that this is part of defendant's burden in its rescission action, notwithstanding Ill.Rev.Stat. ch. 121½, § 737 (1981)), the question in a civil case is which set of the facts is more likely than not. On this record, I simply cannot imagine how anyone could conclude that it is more likely than not that Germain first learned of the violation (that is, the failure to provide Dowmont with the disclosure statement putatively required by law in this case) until January 1980.

Of course, we do not have the district court's view on this matter—we do not know whether he credited the testimony of Beadle that Germain and Aronson had informed him of the disclosure statement requirement; we do not know whether he credited Germain's testimony that he had not consulted with his attorney Schwartz concerning this matter; in short, we have insufficient factual findings from the district court on matters which have only become dispositive upon the reversal of the district court's judgment, on other grounds, that the franchises were not voidable under the Act. Were I deciding these factual questions on the cold record before us, I would find at the very least that Beadle, Schwartz, and probably Germain as well, all had knowledge of the putative violation of the Act in 1975, and their knowledge would be imputed to Dowmont, which can only have knowledge of anything through its officers, agents, and counsel. However, as accustomed as I am to the role of finder of fact, I resist the temptation to substitute my view of a cold record for that of the district judge. Thus, if the majority believes that the case turns on the question of when Dowmont learned of the violation, the case should be remanded for appropriate factual findings.

### The Debould Franchise

Debould was provided with a franchise disclosure statement well before a franchise agreement was executed. However, the district court held that the parties had an oral contract beginning in October 1977. By failing to provide Debould with a disclosure statement prior to entering that relationship, My Pie violated the Act. It is far too late to attempt to *rescind* that oral agreement: that contract was extinguished through merger when the parties executed the written franchise agreement, back dated to October 27, 1977, and it is the written agreement My Pie seeks to enforce. *But cf. Kraft v. No. 2 Galesburg Crown Finance Corp.*, 95 Ill.App.3d 1044, 51 Ill.Dec. 451, 420 N.E.2d 865 (1981). Before entering into that agreement, Debould was provided with the information required by the Illinois Franchise Disclosure Act, and cannot now complain that it entered that agreement improvidently on the basis of the Act.

The majority, however, permits Debould to void that agreement. Relying on the fact that Debould purchased certain supplies (T-shirts and the like) from My Pie (as had Dowmont) several weeks before it received a financial disclosure statement, the majority concludes that My Pie received "consideration" from Debould and thus violated the Act by failing to provide Debould with a franchise disclosure statement. The payment from Debould to My Pie was certainly consideration for something, but consideration for what? Not the franchise, the majority appears to concede. The payment, of course, was consideration for the purchase of the tangible personalty obtained from My Pie. The majority concludes, however, that the objective of the Act would be "seriously undermined" if franchisors could collect money from franchisees in this manner simply by not executing written franchise agreements. The point the majority misses is that My Pie may sell all the T-shirts it wants to anyone without furnishing them with a disclosure statement. The disclosure statement is not designed to protect prospective T-shirt purchasers, it is designed to protect prospective franchisees before they commit themselves contractually to a franchise agreement. I think that the idea behind the statute's reference to consideration is quite straightforward: that if a prospective franchisee makes an advance payment for the franchise before seeing a franchise disclosure statement, he is provided with a remedy under the Act. If the majority's reasoning can be supported in any manner on this point, then Debould should merely be permitted to rescind the offending agreement—*i.e.*, the sales contract for the purchase of the T-shirts—and recover any losses it suffered as a result of the transaction. It certainly should not be permitted to rescind its franchise agreement executed months later, after it was given the franchise disclosure statement.

The *pièce de résistance* of the majority opinion is its recognition of Debould's counterclaim. Several conceptual hurdles need be crossed for Debould to prevail on that claim, and in my view those hurdles have not been cleared.

First, I find the majority's analysis of the applicability of Ill.Rev.Stat. ch. 110, § 13–207 (1981) to actions time barred by § 22 of the Illinois Franchise Disclosure Act, Ill. Rev.Stat. ch. 121½, § 722 (1981), wholly unpersuasive. Relying upon the reasoning of an intermediate Illinois appellate court, the court rejects as "wooden" the reasoning that a limitation contained in the very statute creating a cause of action extinguishes the right, and not merely the remedy, and therefore cannot be resurrected in a counterclaim. The distinction is phrased in metaphysical terms; but there is a sound rationale lingering beneath that nineteenth century legalese. An analysis of the statutory scheme at issue here illustrates the viability of that rationale.

The limitation period in this case represents a legislative judgment that once a certain time period has expired after a violation of the Act, the franchise agreement, theretofore voidable at the option of the franchisee, will be recognized as a binding contract. The limitation period varies according to the circumstances in order to avoid harsh results. Thus, the franchisee's

right to avoid the contract and collect damages terminates only 90 days after he is informed by the franchisor of the violation—at that point, he must make an election whether to ratify or not. (Under the majority's analysis, even if My Pie had expressly informed Debould of the violation in early 1979, Debould would still be permitted to assert its counterclaim here.) A longer limitation period is allowed where the franchisee learns merely of the "fact constituting the violation." The franchisee is given a full year to assess his situation and learn what his legal options are. Once that year expires however, the franchise agreement is binding. The three year limitation period is fixed from the date constituting the act or omission constituting the violation itself, irrespective of the franchisee's knowledge of it. After such a long period has passed, and the parties have operated under the agreement without attempting to extricate themselves from it, the statute will not allow the franchisee to complain about the franchisor's failure to provide it with information concerning the franchisor-franchisee relationship. By that time, the legislature conclusively presumes, the franchisee has had plenty of time to learn about the relationship, decide if it is an unacceptable one, and discover any violations of the Act which may have occurred. Of course, the presumption may not be an accurate one, but that is the nature of limitations periods. The limitations period of the Illinois Franchise Disclosure Act is a legislative attempt to prevent franchisees from playing fast and loose with the law. The law will not suffer a franchisee who operates under a contract for a lengthy period of time and then, when it suits him, attempts to back out of the arrangement on the pretext of a claim which, if important, should have been asserted long before. *See generally Rubin v. Strandberg,* 288 Ill. 64, 68–69, 122 N.E. 808, 810 (1919). This basic notion of fairness should not be easily discarded.

The majority, however, discards the norm embodied in the limitation period of the Act on the basis of *Wood Acceptance Co. v. King,* 18 Ill.App.3d 149, 309 N.E.2d 403 (1974), and the exaltation of the need for protecting the "beguiled franchisee." *Wood* held that a defendant could assert a time barred federal cause of action as a counterclaim to a state cause of action under Ill.Rev.Stat. ch. 110, § 13–207 (1981). The court held that the United States Congress, had it thought about the point, would have wanted the Illinois limitation provision applicable to counterclaims to apply, since the federal statute was passed for the protection of the would-be counterclaimant. The majority here fails to see how the *Wood* court could have distinguished the instant case. Even assuming that is the proper inquiry (and I submit it is not), the majority's reasoning is faulty. The majority recognizes that in passing the limitation period of the Illinois Franchise Disclosure Act, the Illinois legislature may have intended to reject the norm embodied in the special Illinois provision pertaining to counterclaims. It then erroneously states that the same point could have been made in *Wood.* Of course, that point could *not* have been made in *Wood,* since it would have been absurd to argue that the United States Congress actually intended to reject such a state created provision. Moreover, the fact that this argument was not raised in *Wood* in no way means it lacks merit; it simply means that *Wood* did not decide the merits of the argument.

Even if the special counterclaim limitation provision is available to franchisees under the Illinois Franchise Disclosure Act, it is not applicable to the facts of this case. The provision states:

A defendant may plead a set-off or counterclaim barred by the statute of limitation, while held and owned by him, to any action, the cause of which was owned by the plaintiff ..., before such set-off or counterclaim was so barred, and not otherwise....

Ill.Rev.Stat. ch. 110, § 13–207 (1981).

The majority operates from the premise that Debould did not learn of the "fact constituting the violation" of the Act until January 1980, when Germain purports to have learned of the violation—a mixed question of law and fact. I think it clear,

however, that Germain knew of the pure fact constituting the violation—the fact that he had not received the disclosure statement prior to the time the parties orally agreed to the franchise relationship—in 1977. Thus Debould's counterclaim was time barred one year later, in 1978. My Pie's cause of action against Debould did not accrue—*i.e.*, it was not "owned" by My Pie—until March 1979, when Debould first defaulted on its royalty payments. Consequently, because My Pie's cause of action was not "owned by the plaintiff" before Debould's counterclaim was barred, Debould cannot assert its counterclaim under the provision it seeks to invoke.

### Conclusion

The parties litigated a plethora of issues in this case; the Illinois Franchise Disclosure Act questions did not consume the majority of the parties' trial of this case below nor most of their briefs on appeal. In fact, until defendants' reply brief, the briefing on the questions related to the Act was rather sparse.

While I agree with the majority's affirmance on the trademark infringement and trade secrets issues, I believe that some of the questions raised by My Pie deserved some discussion by the majority. Little would be served, however, by recording my analysis of these issues here. Yet, in fairness to My Pie's counsel, I think it should be pointed out that My Pie did attempt to show that the district court's findings were "clearly" erroneous, rather than "merely" erroneous. My Pie argued that the district judge committed clear error when he mistakenly attributed to one of its witnesses the misspelling of a word (the significance of which is too complicated to be explained here) and further invoked recent decisions of this court taking the position that factual findings adopted verbatim from a party's proposed findings are "scrutinized more closely." Perhaps this case would have provided a vehicle for explaining exactly what that means.

Many other issues raised in this case, as the majority notes, are mooted by its conclusion that this case can be disposed of on the basis of the Illinois Franchise Disclosure Act. On those issues, I would affirm the judgment of the district court, with the exception of its holding that the Dowmont covenant against competition was unenforceable.